Scott *v.* The People.

[FOURTH DEPARTMENT, GENERAL TERM, at Rochester, March 5, 1872. *Mullin,* P. J., and *Johnson* and *Talcott,* Justices.]

———— • ◦ •————

J. GOODRICH SCOTT, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

To sustain an indictment for obtaining the signature of an individual to promissory notes given for the price of property sold to him, by false pretenses, the pretenses alleged to be false must be shown to be of some existing fact, and made for the purpose of inducing the purchaser to execute the notes.

Both the inducement and the fraudulent purpose are facts to be proved, and are not to be presumed.

An indictment for obtaining the signature of a purchaser to promissory notes given for the purchase price of property sold to him, by false pretenses and representations as to the price asked for the property by a third person, who was the owner, cannot be sustained, where the proof shows that no representations were made by the defendant, in regard to the price, except that he told the purchaser, in the course of the negotiations, that he did not think the seller would take less than a sum named; and that the only representations as to price, *at the time of the sale and purchase,* were made by the seller. MULLIN, P. J., dissented.

Although the price asked, and finally agreed to be paid by the purchaser, be fixed by collusion between the owner of the property and the defendant, for the purpose of defrauding the purchaser, such collusion, though it may be an indictable offense, is not the offense charged.

If, in fact, the price agreed to be paid by the purchaser was the price demanded by the seller, at the time of the sale, the motive in asking that price is of no consequence, so far as the offense charged is concerned.

WRIT of error to the Jefferson oyer and terminer. The plaintiff in error, Scott, was indicted jointly with one William B. Nicholson, for obtaining, under false pre-

Scott *v.* The People.

tenses, the signature of one George A. Wilson to six promissory notes of $1000 each.

At the close of the proof the prisoner's counsel moved the discharge of the prisoner, on the grounds generally of the insufficiency of the indictment and the proofs; which motion was denied.

The jury found a verdict of guilty in manner and form as charged in the indictment. A motion in arrest of judgment and for a new trial was made upon the case as settled. The motion was denied, with exceptions.

*F. W. Hubbard,* for the plaintiff in error.

I. The indictment fails to charge Scott with the crime, under the statute, of obtaining the notes in question from Wilson under false representations. It is alleged that Nicholson obtained the notes in payment for the one-half of the purchase price of the patent. It is not alleged in the indictment, that Scott had any interest in them. The theory is that Scott confederated with Nicholson to enable him to obtain the signature of Wilson to these notes. If that is true, Scott may perhaps be liable under the statute in regard to conspiracy. (3 *R. S.* 972, § 8. *See statute of Cheats,* 3 *R. S.* 556, § 55.) To be liable under this statute, a person must *obtain* the signature of another. Webster defines " obtain " to mean, " to get—to gain— to gain possession of a thing—to acquire—to keep—to hold." The indictment fails to bring Scott within this definition.

II. The indictment does not charge any offense punishable under the statute of Cheats. (3 *R. S.* 956, § 55.) In order to a conviction under this statute, it will be conceded that the false representation must be of some existing fact known to be false, and uttered with intent to deceive and defraud. (1 *Colby,* 562. 1 *Wheeler's Cr. Cas.* 459. *Barb. Crim. Law,* 131. *The People* v. *Tompkins,* 1 *Park.* 224. 2 *Bishop's Crim. Law,* §§ 397, 409. *U. S.*

*Crim. Law,* 172, 156.   11 *Wend.* 558.   14 *id.* 565.   25 *id.*
401.   41 *Eng. C. L. R.* 183.   7 *Car. & P.* 825.   *Wharton's
Am. Crim. Law,* § 208.   *Barbour's Crim. Law,* 137, 2d *ed.*
3 *Term R.* 98.)   It must not be the expression of an opin-
ion, or a mere act done, however calculated to deceive,
(1 *Wheeler's Crim. Law,* 448,) or a promise of something
to be done in the future.   (*Ranney* v. *The People,* 22 *N. Y.*
413.)   These principles are recognized by the court in its
charge to the jury, and hence excluded from the jury the
1st, 3d, and 4th allegations in the indictment.   The first,
because it was a mere expression of opinion, in regard to
the value of the patent.   The third, because it was prom-
issory in its character, that Scott would purchase one-half
the patent; and the fourth, because it related to an act
done—the turning out the securities.   The court held that
the second allegation embraced a representation as to an
existing fact, and if made and was knowingly untrue, it
was punishable under this statute.   This ruling was ex-
cepted to, and the court was requested to charge the con-
verse, which it declined to do, with exception.   The
allegation is this : " That the real and true price in money
asked, named and fixed for the said improvement, and
letters patent by the said William B. Nicholson, was the
said sum of $12,000."   The negation is : " Whereas, in
truth and in fact the real and true price in money asked,
named and fixed for the said improvement and letters
patent by the said William B. Nicholson, was not the said
sum of $12,000, but, on the contrary, was the sum of $3000
only."   1. In the first place, we say there is no allegation
in the indictment that Scott made any representation on
the subject.   It is alleged that the price was named and
fixed by Nicholson alone, upon his own patent, and for
his own benefit.   2. We submit, that if the indictment is
sufficient as it respects Scott, in form, it does not charge
an offense under the statute.   The statement of a price at
which Nicholson will sell the patent, is not a statement

Scott *v.* The People.

of an existing fact, much less is it a representation. It is neither a statement or representation of any fact—it is simply the expression of a proposition; an offer. The asking price of a thing is ideal, speculative, does not embody any fact or reality. Webster defines a *fact* to be, " 1. Anything done, or that comes to pass—an act—a deed—an effect produced or achieved—an event; 2. Reality—truth." An existing fact must be some definable thing, event or reality—something existing, to which the representation relates—not created or existing only in the representation itself. The attempt was made on the trial, to prove that the price had been fixed between Nicholson and Scott at $3000; but the difficulty is, there is no representation alleged as to that. The case would be different if it had been alleged that it was represented that the price fixed between Nicholson and Scott was $12,000, whereas, in fact, it was but $3000. There would be a misrepresentation of an existing fact. Here the only thing alleged is that $12,000 was the price Nicholson asked, or named for the patent. This, as before remarked, is not a fact—a representation of some collateral—it is simply a statement of the price he then fixed upon his patent. The negation cannot enlarge the representation alleged. The office of a negation is to affirm the falsity of the representation, and nothing more. 3. The representation, as alleged, does not state with whom, or between whom, the price of the patent was fixed. It simply states that Nicholson said his price was $12,000. As between Nicholson and Wilson that was true; that was the price he then named. 4. The statute does not authorize conviction, because of the suppression of the truth. Responsibility arises only upon the truthfulness of the representations of facts actually made, not upon omissions. There is no allegation in this indictment in regard to any other price than the one stated by Nicholson to Wilson of $12,000—no allegation that any price had been previously named to Scott. 5. To prove

that Nicholson had previously proposed to sell to Scott for $3000, does not falsify the statement that his price was $12,000; as to Wilson, that was his price. Hence we insist that the indictment does not allege, in this particular, any offense, cognizable under the statute, in relation to false pretenses.

III. The representation, as charged in the indictment, is not one calculated to deceive or mislead, and therefore not indictable. A person of ordinary prudence could not be prejudiced. (1 *Colby*, 563. 4 *Hill*, 9.) Wilson must have understood that the price of a patent is a mere fanciful, indeterminate thing—may be $1000, or $25,000. The bantering about the price, by the parties, shows it was so understood. Wilson got all he bargained for, and would not be defrauded by this representation of value. The court must see that this matter of price was of slight consideration with Wilson, in inducing him to give these notes. The fact that Scott was purchasing one-half at $6000, must have been most potential with him.

IV. It was not competent, on the trial, for the prosecution to prove that the price between Nicholson and Scott was fixed at $3000. The representation, as alleged, does not embrace any such fact; no allusion is made to any price of the patent, except as there stated by Nicholson to Wilson. But conceding the proof competent, it fails to show that the price of the patent, as between Nicholson and Scott, was $3000. Nicholson is the only witness who speaks on the subject, and this is all he says: "He (Scott) asked what I would take for it; I said $3000; he said he would get me three good notes for it, but I must ask $12,000, or $15,000 for it, so he could make something out of it." Here is no sale, or proposal of sale, of the patent to Scott. Scott merely inquires what he would take, and Nicholson says $3000. Here was no price fixed on the patent. The substance is, Nicholson is content if he can get $3000, and is willing that Scott should have

the surplus for his services. We insist that this evidence does not sustain the negation in the indictment; that the price was, in fact, fixed at $3000 instead of $12,000.

V. It may be insisted on the other side, that the representation by Nicholson, fixing the price at $12.000, was done at the instance and request of Scott. Suppose that be conceded, we say, in answer, that according to the testimony of Nicholson quoted above, it is true—it is precisely according to the arrangement between Nicholson and Scott. As between them, Nicholson would be satisfied with $3000, but as to the purchaser, Nicholson was to ask from $12,000 to $15,000. This was an arrangement which they had a right to make, and it is no fraud upon the purchaser not to disclose the fact that Scott was to have all that could be obtained over $3000. Under this statute a party is only liable for a false statement made by him, with intent to cheat. Here then, was no false statement; what Nicholson did say was, that he would take $12,000 for the patent. That was in and of itself true, and was in accordance with the arrangement made with Scott.

VI. Upon the theory that there was but one representation in the indictment properly before the jury, as the court finally held, all the evidence which pertained solely to the other specifications, which was objected to, was erroneously received.

VII. We ask a reversal of the conviction, upon the several grounds above mentioned, but especially upon the ground that the indictment does not charge a criminal offense against Scott under the statute; that the asking or fixing a price on a patent, is not a representation of any existing fact; that if it is, the representation is not proved to be false; that there was no fixing of any price upon the patent, as between Nicholson and Scott; that what Nicholson did say to Wilson about the price, was truthful, and was not in any sense false; that whatever question of

morals there may be in the case, there has been no crime committed under the statute in regard to false pretenses, which, under well settled adjudications, is to be rigidly construed.

*P. C. Williams,* (district attorney,) for the people.

I. The representation alleged in the indictment, and submitted to the jury, is sufficient to sustain a conviction. It is a representation of an existing fact. If there was a real, true price named and fixed by Nicholson for the patent, it was an existing fact, a misrepresentation of which would be sufficient to sustain a conviction.

II. The evidence is sufficient to sustain the allegation in the indictment, that the prisoner made the representation. The prisoner and Nicholson were acting in concert, and according to a previous arrangement, that the price, though $3000 in fact, should be stated by Nicholson to be $12,000, in order to deceive Wilson, induce him to give six notes, and thus put $3000 into the prisoner's pocket. Nicholson stated the price to be $12,000, by the defendant's procurement, and according to such previous arrangement. The prisoner was present and acquiesced in it, and by all his acts and words, aided in making the representation, and in inducing Wilson to believe it to be true. Where two parties are thus acting in concert in the commission of an offense, each is responsible for the words and acts of the other. No authority would seem to be necessary to establish this general proposition. The attention of the court is asked to the following cases, however, as peculiarly applicable to this branch of this case : *Fowler* v. *The People,* (18 *How.* 493;) *Adams* v. *The People,* (1 *Comst.* 173.)

III. The falsity of the representation is fully established by the evidence. Nicholson's real price for the patent was $3000 ; he so told the prisoner, and that was the amount he actually received for it. He never, in good faith,

Scott *v.* The People.

stated or named any other price, except in pursuance of the arrangement with the prisoner, and that was done, not because his price was changed or different, or because he expected to receive any different price, but simply and only to enable the prisoner to cheat and defraud Wilson out of the balance over and above his real price, $3000. In other words, I say if this judgment can be legally sustained, it ought to be.

JOHNSON, J. The plaintiff in error was indicted with one Nicholson, for obtaining the signature of George A. Wilson, to six promissory notes of $1000 each, by false pretenses, upon the purchase by the latter of Nicholson, of the title to one half of a certain patent right. Several pretenses alleged to have been false were set out in the indictment, only one of which it will be necessary to consider, as the judge who presided upon the trial, when submitting the case to the jury, charged and instructed them that upon that one only could the plaintiff in error be convicted of the offense charged.

That pretense was in regard to the real and true price for the whole right. The charge in the indictment upon this subject, was that Scott, the plaintiff in error, and Nicholson, falsely pretended and represented that the real and true price in money, asked and fixed by Nicholson for the said right, was the sum of $12,000, whereas, in truth, the true price in money, asked and fixed for said right by said Nicholson, was only $3000. The plaintiff in error was convicted on this charge in the indictment, his accomplice, Nicholson, the owner and vendor of the patent, being used as a witness by the people. The only facts in regard to the price, and the representations in respect to it which the evidence tended to prove, were that Nicholson, who was the owner of the patented right, desired to sell the same, and wished the plaintiff in error to assist him in making the sale. That the plaintiff in error in-

quired of Nicholson what he would take for his right, and was informed by Nicholson that he would take $3000. That thereupon the plaintiff in error informed Nicholson that he would get him three good notes for it, but he, Nicholson, must ask $12,000 or $15,000 for it, so that he, the plaintiff in error, could make something out of it.    On the evening of the same day, the plaintiff in error and Nicholson together saw Wilson, and negotiations commenced for the purchase of the right.    Nicholson at first asked $15,000.    Wilson thought the price ought not to be over $10,000; but it was finally fixed by Nicholson at $12,000, and the bargain was made at that price.    The plaintiff in error pretended to be a joint purchaser with Wilson of the right.    Wilson gave the notes in question for his half of the purchase price, and the plaintiff in error pretended to give separate securities for his half.    The patent was then duly transferred to Wilson and the plaintiff in error, who became the owners thereof.    After the trade was thus consummated, Nicholson returned to the plaintiff in error, the securities he had turned out, and the six notes given by Wilson were divided between Nicholson and the plaintiff in error, each taking three.    There was some conflict in the evidence in regard to the representations as to the price; but the judge charged the jury that if they found the representations in respect to the price to be false, as charged in the indictment, they should render a verdict of guilty, against the plaintiff in error.

The question whether the indictment in this particular, set out any such offense, and also whether the evidence on the subject of price, admitting all that was testified to on behalf of the people to be true, was sufficient to establish the crime of obtaining the signatures to the notes by false pretenses, was sufficiently raised in various forms by the counsel for the plaintiff in error.    That the contrivance between Nicholson and the plaintiff in error, by which the trade was effected, and the notes obtained from Wilson

Scott *v.* The People.

was grossly unfair and dishonest, in a moral point of view, must, of course, be admitted. But it does not follow from this, that the transaction constituted the crime of obtaining the signatures to the notes by false pretenses, as charged in the indictment. Wilson, by the bargain, got all he bargained for, and all he expected to get, to wit, the title to one half the patent right, and whether it was worth more or less than the price he agreed to pay by his notes, the case does not disclose. The case, as it stands upon the evidence, is, not that Wilson was really injured and suffered loss by the bargain, but that he might have made a more advantageous purchase, and gained more, had the facts in regard to what Nicholson was to receive been stated and made known to him. The point is, was there a false representation as to price, at the time of the trade, which was material in the eye of the law. There is no evidence to show that the plaintiff in error made any representation whatever in regard to the price, except that he told Wilson, in the course of the negotiation, that he did not think Nicholson would take less than $12,000. This was a false and dishonest expression of an opinion as to what Nicholson would or would not do; but it was no representation as to what Nicholson's price in fact was. All the representations as to the price, were made by Nicholson. Had the indictment been for a conspiracy to cheat, between Nicholson and the plaintiff in error, Nicholson's representations, for the purpose of effecting the common object, might be held to be those of the plaintiff in error. But that rule, I apprehend, does not apply to a case like this. But whether this is so or not, it is perfectly well settled that the pretense alleged to be false, must have formed some part of the inducement to the doing of the act, and must be of some existing fact, and made for the purpose of inducing the prosecutor to part with his property, or to do the act. Both the inducement and the fraudulent purpose are facts to be proved, and are

not to be presumed. It is to be borne in mind that the false pretense charged, and upon which the conviction was had, was that the price of the patent was $12,000, when in truth it was only $3000; and we are to look at the case now, as though nothing else had been charged in the indictment, and no proof given in regard to any other pretense which was there charged, as the other pretenses, and the evidence relating thereto, were all stricken out, or held to be out of the case. The notes, it is certain, were signed by Wilson, to complete his purchase, and obtain his title to one half of the patent right. It is quite apparent that he would not have given his notes for $6000 for this interest, if the price asked had been only $1500, or $3000 for the entire right. To suppose the contrary, would be against all experience in commercial transactions, and all the grounds of common inference.

We all know that the higher price enters into the inducement of the seller to sell, and the lower price enters into the inducement of the purchaser to purchase. The old struggle for the higher price on the part of the seller, and the lower price on the part of the purchaser, which began at the beginning of traffic between men, still continues, and from the very nature of things, must continue as long as commerce is carried on. When, therefore, Wilson, the purchaser, testifies that he would not have signed these notes for $6000 if he had supposed the price was not $12,000, but only $3000, we can see that he only intends to say that he would not have given that price if he had understood he he could have purchased for less; and not that the fixing of the high price formed, or entered into, the inducement to make the purchase and sign any notes to complete it.

But in regard to the existing fact as to the price, how is that? Price is the value which a seller places upon his goods for sale. It is not a fixed and unchangeable thing. It may be one thing to-day and another tomorrow, and one valuation to one customer, and a different one to

Scott *v.* The People. .

another on the same day or hour.    Whatever a seller asks any one to give is the price, until he changes it for another. The price asked is the existing fact, until it is changed. When the price asked is changed to another price, the former price is no longer an existing fact.    The existing fact is not what a party may be willing to take in case he cannot do better, but what he then proposes to take.    The indictment in this case, in this respect, and the evidence on the part of the people, and the charge of the judge to the jury, all proceed upon the assumption that the price asked, when this bargain was made, was not the price, but something different; a mere false pretense.    This is a mere confusion of ideas.    That $12,000 was the price that Nicholson in fact asked on the occasion of that trade, no one denies, but all the evidence, on both sides, conclusively establishes.    He first asked $15,000, and was offered $10,000.    He finally came down to $12,000, and avowed his intention not to sell at that time unless he could get that price.    There is no chance for dispute about this, at least on behalf of the people.    But it is said that this price was fixed by collusion between Nicholson and the plaintiff in error for the purpose of defrauding Wilson. This may be so, but it does not affect the question we are considering.    That may have been an offense of another character, but it was not the offense in question.

No matter, so far as this question is concerned, how the price came to be fixed, and asked, or pretended, at that amount.    It was in fact asked, and though it may have been asked for the purpose of taking a dishonest advantage of Wilson, the asking was the existing fact.    No other price was asked, or named, or fixed between the parties to the transaction, on that occasion, than those above referred to.

The motive in asking this large price is of no consequence, so far as this offense is concerned, if, in fact, the price was demanded by the seller.    It would be a most

extraordinary and unheard of thing to convict a merchant of obtaining money, or the signature to a note, by false pretenses, because in selling his goods, by which the money or the note was obtained, he had asked the purchaser, and obtained, a higher price for the goods than his price mark, or than he had offered to sell the same goods to another customer, or than he would have been willing to take, had the purchaser refused to give the pretended price asked, and insisted strongly enough upon a lower price.

Or, take the case of a person who procures the aid of an agent or broker to assist him in making sale of his property, real or personal, and who is willing, and proposes to such agent to sell at a given price, but who at the suggestion of the agent consents to ask a higher price, and to give the difference between the two prices to the agent in case the higher price can be obtained; can it be pretended for a moment, that either the principal or the agent could be convicted of obtaining money, or the signature of the purchaser to obligations, by false pretenses in regard to price, even though, as in the case before us, they had pretended that the higher price was the true and only price, and that they would refuse to sell for anything less. The cases are precisely analogous, so far as the false pretense is concerned. The element of collusion and conspiracy, which has been brought into the case at bar, belongs to another and different class of offenses. It must be seen, we think, and admitted, that the false pretense as to the price charged and sought to be proved in this case, is not the false pretense contemplated by the statute, and that the plaintiff in error was wrongfully convicted of that offense.

The judgment should therefore be reversed, and the plaintiff in error discharged absolutely.

TALCOTT, J. concurred.

Scott *v.* The People.

MULLIN, P. J., (dissenting.)   The only representation upon which the court permitted the jury to pass was, "whether the real and true price, in money, of the patent right which Nicholson had for sale, was the sum of $12,000."

The making and falsity of this representation, with a felonious intent, is found by the jury.   Thus three of the ingredients of the crime are established.

There remains but one other ingredient to be established in order to complete the crime charged in the indictment, and that is, that the representation was such an one as was calculated to deceive a person of ordinary prudence.   (*The People* v. *Williams,* 4 *Hill,* 9.)   This must also have been found by the jury.   But as it is a mixed question of law and fact, it is the duty of the court to determine for itself whether the representation was of a kind which would impose on a prudent, cautious man.

To pass upon this question intelligently, a brief reference to the facts established on the trial is indispensable. Nicholson, the owner of a patent for curing and packing cheese, resided in Lewis county, and desired to sell it. Scott resided in Jefferson county and was a dealer in patent rights.   Wilson resided in the same place, and desired to engage in the purchase and sale of such rights. Scott learned from Nicholson that he would sell the patent for $3000.   Scott then represented to Wilson that the right Nicholson had for sale was a valuable one, and urged him to purchase part of it, and told him that he (Scott) would purchase one half, if Wilson would purchase the other half.   Scott told Wilson the actual price at which Nicholson would sell was $12,000.   On procuring Wilson's consent to enter into negotiations for the purchase of said right, Scott telegraphed to Nicholson to come to Watertown.   When he came, Scott told him a sale could be effected, but he must put the price at $12,000 or $15,000, so he (Scott) could make something out of it; to

which Nicholson assented. Wilson was invited to Scott's house to meet Nicholson, and on arriving there, Wilson inquired of Nicholson the price for which the right could be purchased, and he was told $12,000. Scott held two or more private interviews with Wilson during the pendency of the negotiations, in which he urged Wilson to purchase at the price named, assuring him that it was the actual and true price, agreeing to take and pay one half, and finally Wilson agreed to purchase one half, and Scott the other half, at $6000 each.

Scott produced and transferred to Nicholson securities for the price of his half, and Wilson gave six notes of $1000 each, for his half, and Nicholson transferred his interest in the patent in pursuance of such agreement. Wilson left, leaving Scott and Nicholson together. After Wilson had gone, Nicholson surrendered to Scott the securities which the latter had delivered to him, and his purchase was rescinded. Nicholson also delivered to Scott three of the $1000 notes, thus securing to Scott $3000 as compensation for the cheat he had practiced on Wilson.

Wilson did not know, and he had no means of knowing, that the price asked by Nicholson was $3000, and that it was raised at the request of Scott, not because Nicholson desired or demanded any higher price, but to enable Scott fraudulently to obtain from Wilson $3000.

What higher degree of prudence or caution could Wilson use than he did use, during the negotiations for the purchase of the right under the patent? He called on the vendor himself, and was assured that the price stated by Scott was the true one; that is, that it was the lowest price at which the interest of Nicholson could be procured. To obtain the interest at the lowest price was one of the efforts of Wilson, and as he had reason to suppose, of Scott also, in the negotiations for the purchase; but his efforts were entirely frustrated by the fraudulent combina-

Scott *v.* The People.

tion to raise the price in order the more effectually to ac-
complish the cheat.

That Wilson was cheated out of $3000 is too plain to
admit of doubt. But it is said, and my brethren decide,
that, conceding the cheat, no crime has been committed
which the law can punish. If the criminal law is so de-
fective that it cannot reach and punish an offender who
commits such an outrageous fraud, it is time that the legis-
lature had supplied the defect and provided a punishment
commensurate with the villainy manifested in the com-
mission of the cheat.

The reasoning which extracts the criminality from the
acts and representations of Scott and Nicholson is, that
the latter was not bound by his arrangement with Scott
to limit the price of his interest to $3000, which he at first
asked therefor, but might raise to $12,000 or $15,000,
and he did not thereby do any wrong to Wilson ; and that
it was the ordinary case of a vendor increasing the price
of his property, of which a purchaser has neither a legal
nor moral right to complain. Such a view of the case
ignores, utterly, the villainy that pervades the entire trans-
action. No one doubts the right of Nicholson to demand
a higher price for his interest. But he never did make
any such demand. The price first asked of Scott was the
price finally received. The increase was made at the re-
quest of Scott, not because a higher one was demanded or
expected, but in order to enable him to defraud Wilson.

This case is likened to one where a person applies to
the owner of land or other property to ascertain the price
at which he will sell. Having ascertained it, he gets per-
mission to sell it, and take to his own use all he can obtain
over and above the price thus asked, and who, in order to
obtain a higher price than he otherwise might, induces the
owner to say that his price is the one demanded by the
person offering to sell it, and not the price which the
owner has agreed to receive for it. The sale, if effected

for the increased price, might, upon this state of facts, be a fair one.

To prevent the transaction from being fraudulent, as thus stated, we must assume that the owner puts the lower price on the property, as a matter of favor to the person whom he authorizes to sell, and reserves to himself the right to demand of others the higher price. For if he is willing to take the lower price of any person desiring to purchase, and falsely represent the higher to be his real price, he is at least guilty of falsehood, if not of fraud.

But the case supposed wants sundry elements which enter into, and form part of, the case before us. Wilson knew nothing of the value of the right. Scott did; he was a dealer in such property. He professed to act in aid of Wilson, in making the purchase, at the lowest price. To induce the belief that his assistance and representations, as to the price and value, were sincere, he proposed to join in the purchase.

Whether the part Nicholson took in the transaction, rendered him liable, jointly with Scott, for the fraud, it is not necessary now to determine; but that the acts of Scott are such as to distinguish this case from the one supposed, and to subject him to criminal liability, I entertain no manner of doubt.

I have searched, with some care, for a case analogous to the one before us. I have found but one, and that is the case of the *State* v. *Rowley*, (12 *Conn.* 101.) It was an information against Rowley and one Baldwin. The prosecutor alleged that Rowley was possessed of a tract of land in Winchester, on which there was a quantity of wood, of the value of $200, and no more. That Baldwin owned a quantity of lumber of the value of $100, and no more. That they, designing to to dispose of such wood and timber at a much greater price than their value, did wickedly and unlawfully conspire together to cheat and defraud all persons whom they could induce to purchase

said wood and timber, and especially Tucker & Case.
That for this purpose it was agreed between Rowley and
Baldwin that Baldwin should apply to Tucker, and fraud-
ulently induce him to purchase Rowley's wood, &c., for
Baldwin, in the name of Tucker, at a price greatly exceed-
ing its value, and should then refuse to take the wood of
Tucker, but leave it on his hands; and that Rowley
should, in like manner, apply to Case to go to Baldwin
and purchase his lumber for Rowley, at a sum much
greater than its value, and then refuse to receive it, and
leave it on his hands. Both of these arrangements were
carried into effect. Tucker & Case were ignorant of
such fraudulent combination. Baldwin and Rowley utterly
refused to carry out said agreement, leaving the property
so purchased on the hands of Tucker & Case to their injury,
and they did fraudulently obtain from said Tucker & Case
their notes for a large sum, to wit, $2700. The information
concluded thus: "And the said attorney says that the said
Rowley and Baldwin, by means of their fraudulent con-
spiracy, and by their false pretenses, did willfully defraud
and deceive said Tucker & Case, and did obtain from them
said notes, being of the value of $2700, against the peace.

Subsequently to the presentation of said information,
the attorney for the State applied to the court for leave to
add a count for a conspiracy, which, for reasons assigned
by the court, was refused. The defendant's attorney de-
murred to the information, on two grounds, as it would
seem from the points made by him on the argument. These
were: 1st. That the facts charged in the information do
not constitute an offense, within the provisions of the
statutes of Connecticut, against obtaining goods by false
pretenses. 2d. The facts charged do not constitute a con-
spiracy to defraud, that would be punishable at common
law. The court overruled the demurrer, holding that the
information charged the prisoners with the crime of ob-
taining property by false pretenses, and also with a con-

spiracy to obtain property of Tucker & Case by such pretenses. If that case decides the propositions above stated, it is an authority in support of the conviction in that case. The reporter of the case commences with the statement that the information was for a conspiracy. But the demurrer treats the information as charging both offenses. That it charged a conspiracy is certain, and that the court held it to charge the crime of obtaining property by false pretenses, I shall show by the language of the learned judge who delivered the opinion of the court. After citing and commenting on several English statutes, relating to false pretenses, and the statutes of Connecticut on the subject, Bissel, J., refers to cases in the English and American courts which, in his view, bring the case made by the information within the Connecticut statute relating to false pretenses. He then refers to the case of *Young and others* v. *The King*, (3 *T. R.* 98,) in which it was held that obtaining money under the false pretense that a bet had been laid that a pedestrian feat would be performed in a given time, was within the English statute. Bissel, J., then proceeds: "It is certainly difficult to see why this case, (the one cited,) if it is to be regarded as an authority, does not govern the case now before us. Indeed the case would seem to be stronger than any of those which have been cited; for here, not only were the notes obtained by means of false pretenses, but these pretenses were put word for word, in pursuance of a conspiracy between the defendants, to cheat and defraud. That the facts set forth in the information are within the words of the statute, is too clear to admit of argument. That they constitute an offense against the laws of morality is equally indisputable, and we are unable to discover any reason, founded either in principle or authority, why they should not be held to be within the meaning of the act.

This view of the case, he says, "renders it unnecessary

Scott *v.* The People.

·for us to express a decided opinion whether the facts ·charged in the information constitute a misdemeanor at the common law. But we are strongly inclined to the opinion that they do."

After stating that the prisoner's counsel claimed that the false representations were made separately by them, and not jointly, he says: " This is not a correct view of the case. It is indeed taking out the very vitals of the information. The gist of the offense charged is the unlawful conspiracy, and whatever was done was done in pursuance of it."

The opinion closes as follows : . "It is unnecessary to pursue this inquiry further, as we are of opinion that the case falls clearly within the statute, and on that ground the count must be sustained." The statute within which the case fell was the statute relating to false pretenses, . and no other. Whether the information charged a conspiracy, was not material in the case ; nor is it important for me to inquire whether the dictum of the learned judge on that point was correct.

It would seem to have been admissible under the law of Connecticut, in an indictment or information against two or more for crime, to charge that it was committed in pursuance of a conspiracy, and if the jury failed to convict of the crime, they might convict of the conspiracy.

This case is one to which the language of Lord Kenyon, in *Young* v. *The King,* ·(*supra,*) most forcibly applies. " The defendants, morally speaking, have been guilty of an offense, and when the criminal happens to be auxiliary to the law of morality, I do not feel any inclination to explain it away. These defendants have, by false pretenses, fraudulently continued to obtain money from the prosecutor, and I see no reason why it should not be held to be within the meaning of the statute."

The false pretenses by which Rowley and Baldwin obtained the notes of Tucker & Case, were that they

(Rowley and Baldwin) would take the property which Tucker & Case should purchase off their hands, and that the property was worth much more than the prices asked by Rowley and Baldwin for it.

This last consideration must have been the controlling one, or it is difficult to comprehend why Tucker & Case should have been induced to make the purchase, or how the crime of obtaining goods by false pretenses could have been committed.　The course of proceeding between Baldwin and Tucker, for example, would seem to have been this.　Baldwin told Tucker that Rowley had wood for sale, which he (Baldwin) wanted to buy, because it was much more valuable than the price ($1500) he asked for it, that Tucker could purchase it cheaper than he (Baldwin) could, and he wanted him (Tucker) to purchase it in his own name, and he (Baldwin) would take the property off his hands and assume the payment of the note given to Rowley for it.

It must be assumed that Tucker & Case did not know the value of the property, and relied, therefore, on the statement that "great profits" could be made out of it at the price named.

If the property was of much greater value than the price paid, Tucker & Case would have security in their own hands, should Rowley and Baldwin refuse, or become unable to take and pay for the property.　If this was the transaction, a motive is found for Tucker & Case being drawn into the purchase.　But if the only inducement was the promise by Rowley and Baldwin, that they would take the property off their (Tucker & Case's) hands, it is difficult to perceive wherein Rowley and Baldwin were guilty of doing more than violating their agreement to take and pay for their property.　If the property for which Tucker & Case gave their notes for $3000 was, in truth, worth but $300 or $400, they were grossly defrauded, unless Rowley and Baldwin should perform their agreement.　If this is a

correct view of the transaction, as I believe it to be, between the parties, the case cited is an authority in support of the conviction in this case.

It is said that the only offense for which the prisoners Scott and Nicholson could be indicted, was that of conspiracy to cheat and defraud Wilson. The answer to this suggestion is, that if the crime of obtaining the notes by false pretenses was actually committed, as it is found to have been, by the jury, the conspiracy was merged in the higher offense—the felony—and all liability for that offense was gone. (*The People* v. *Mather*, 4 *Wend.* 229, 265.)

Obtaining goods by false pretenses is made felony by the Revised Statutes. (3 *R. S.* 956, § 55, *5th ed.*) A conspiracy is, by the same statutes, declared to be a misdemeanor. (3 *R. S.* 972, § 8, *5th ed.*)

If the false and fraudulent representations used to obtain the notes of Wilson were not criminal, then there was no conspiracy.

To constitute a conspiracy, two or more persons must conspire, amongst other things, either "*to cheat and defraud some person of property by means which are in themselves criminal, or to cheat and defraud a person of property by means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses.*" (3 *R. S.* 972, § 8, *5th ed.*)

If, therefore, it be true that the pretenses set out in the indictment do not amount to obtaining the notes by false pretenses, the prisoners were not guilty of a conspiracy.

If it be true that the acts done, and the representations made, by the prisoners, which have been charged and proved, constitute no crime, an extensive field is open for the knave to cheat and defraud, with entire freedom from any description of liability or responsibility to any criminal tribunal. But his exemption does not end there; he

must also be exempt from any civil liability to the party injured.

If the pretenses used by Scott and his confederate, being untrue, are not material, or such as should deceive a man of ordinary prudence and caution, a civil action will not lie for the property obtained. If of that character, they are not material, and if not material then there is no responsibility. (2 *Parsons on Cont.* 267, 270, *1st ed.*)

Can it be possible that the law is so defective, or its arm so short, that it cannot give the injured party redress for such a wrong, nor punish the party who has committed it? I will not believe it.

It said that no injury was proved to have been sustained by reason of the fraud practised by the defendant. Scott got $3000 from Wilson, more than he would have been obliged to pay if the truth had been told to him. It is true that it was not shown whether the value of the interest which Nicholson sold was worth more or less than $12,000, except by agreement of Nicholson to take $3000, and actually receiving that sum. But the representation was that the real and true price was $12,000, when in fact it was but $3000. The falsity of this representation was proved, and this was all the public prosecutor was bound to prove, and when proved, a cheat to the extent of $3000 was clearly established.

The conviction should be affirmed.

Judgment reversed.

[Fourth Department, General Term, at Rochester, March 5, 1872 *Mullin*, P. J., and *Johnson* and *Talcott*, Justices.]