TAMIAMI PARTNERS, LTD., Plaintiff,

v.

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, Defendant.

No. 92–0489–CIV.

United States District Court, S.D. Florida.

Aug. 19, 1992.

---

Sanford L. Bohner, Miami, Fla., for plaintiff.

Dexter Lehtinen, Miami, Fla., for defendant.

## SECOND OMNIBUS ORDER

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Plaintiff Tamiami Partners Ltd.'s ("Tamiami Partners") Emergency Motion for Order Enjoining Tribe from Exercising Self Help to Terminate Management Contract. On April 7, 1989, the Miccosukee Tribe of Indians of Florida ("Tribe") entered into a Management and Economic Development Agreement ("Management Agreement") with Tamiami Partners, as authorized by Chapter 29, Title 25, of the United States Code, "Indian Gaming Regulation," 25 U.S.C.A. §§ 2701–21 (West Supp. Pamphlet 1991). Pursuant to the terms of the Management Agreement, Tamiami Partners currently operates a bingo hall ("the gaming enterprise") inside the Tribe's reservation.

On August 9, 1991, the Tribe adopted Ordinance No. 08–09–91, prescribing the licensing process for "primary management officials and key employees" of the gaming enterprise.[1] The ordinance empowers the Chief of Police to conduct background investigations and to issue temporary permits pending the Tribal Gaming

Agency's decision to issue or deny licenses.[2]

In early and mid-July 1992, the Tribal Gaming Agency announced its denial of seventeen applications. Asserting that these mass denials, which it characterizes as self-help, were decimating its work force and impeding its operation of the gaming enterprise, Tamiami Partners filed this emergency motion seeking injunctive relief from the Tribe's licensing process.

The Court held an emergency hearing on this matter on Friday, July 24, 1992. After the hearing, the Court issued a temporary injunction pending the Court's review of the Tribe's licensing process. For purposes of this review, the Court held evidentiary hearings on August 4 and 5, 1992. In addition to the oral testimony, the Court has received numerous affidavits, as well as records of the licensing process, which the Tribe filed under seal pursuant to the Court's confidentiality order. The parties have also submitted the following motions and supplemental memoranda:

(1) Supplemental Memorandum in Support of Tamiami Partners, Ltd.'s Motion for Injunctive Relief;

(2) Motion of Miccosukee Tribe for Reconsideration of the Court's July 24, 1992, and Supplemental Memorandum;

(3) Tribe's Post–Hearing Memorandum in Opposition to Extending Emergency Injunction, and Tamiami Partners' Reply;

---

**1.** The Indian Gaming Regulatory Act ("IGRA") states, in pertinent part, that the Chairman of the National Indian Gaming Commission "shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming [such as bingo] on the Indian lands within the tribe's jurisdiction if such ordinance or resolution" provides, *inter alia,* an adequate system, which:

(i) ensures that background investigations are conducted on the primary management officials and key employees of the gaming enterprise and that oversight of such officials and their management is conducted on an ongoing basis; and

(ii) includes—

(I) tribal licenses for primary management officials and key employees of the gaming enterprise with prompt notification to the Commission of the issuance of such licenses;

(II) a standard whereby any person whose prior activities, criminal record, if any, or

reputation, habits and associations pose a threat to the public interest or to the effective regulation of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming shall not be eligible for employment; and

(III) notification by the Indian tribe to the Commission of the results of such background check before the issuance of any such licenses.

25 U.S.C.A. § 2710(b)(2)(F) (West Supp. Pamphlet 1991).

**2.** "Tribal Gaming Agency means the Business Council of the Miccosukee Tribe of Indians of Florida." Ordinance No. 89–09–91 of the Miccosukee Tribe of Indians of Florida Regarding Licensing of Certain Gaming Personnel [hereinafter "Ordinance No. 89–09–91"], Section 2.6.

(4) Tribe's Memorandum Regarding Remedies and Redressability Issues, and Tamiami Partners' Reply;

(5) Tribe's Motion to Dismiss; and

(6) Tribe's Motion to Strike Affidavit of John Sisto and Portions of Affidavit of David Ingenito.[3]

## PROCEDURAL BACKGROUND

The Court is very familiar with the ongoing controversy between Tamiami Partners and the Tribe. Upon the filing of this action, Tamiami Partners sought an emergency injunction to compel arbitration, pursuant to the terms of the April 7, 1989 Management Agreement. Tamiami Partners also asked the Court to prevent the Tribe from taking any action to seize or assume control of the gaming enterprise pending arbitration.

Although the Court found that it had jurisdiction over the dispute, the Court chose to abstain from exercising its jurisdiction pending exhaustion of tribal remedies. *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 788 F.Supp. 566, 570 (S.D.Fla.1992).[4] Rather than dismissing the action, however, the Court issued a stay, thereby keeping the federal forum readily available should circumstances no longer warrant the Court's abstention. *Id.* at 570. Accordingly, the Court specified that the stay would be automatically lifted upon the occurrence of any of the following events: exhaustion of tribal remedies; use of self-help by the Tribe to evict or otherwise impede Tamiami Partners from operating the gaming enterprise; or the provision of less than two business days' notice to Tamiami Partners of impending action pursuant to a tribal court order. *Id.* at 567.

## THE PRESENT DISPUTE

As noted above, on August 9, 1991, the Tribe adopted an ordinance for licensing gaming personnel. Although the ordinance became effective August 19, 1991, the formal licensing process of Tamiami Partners' employees did not commence until December 17, 1991.[5] In addition, Tamiami Partners' investors submitted their licensing applications and new employees applied as they were hired. As provided by the licensing ordinance, upon receipt of the applications, the Police Department issued temporary permits to those applicants whose documents appeared to be in order.[6]

On July 3, 1992, the Tribe denied eight license applications. On July 22, 1992, the Tribe denied nine more applications. A review of the Tribe's confidential licensing records reveals that these seventeen denials included: the general manager and program director; the accounting manager; seven out of nine money room clerks; four bingo callers; the maintenance supervisor; and three investors. Contemporaneously with the seventeen denials, the Tribe approved sixteen applications, which, again according to the confidential licensing records, included: the two operations managers; the supervisor of cashiers; a concessions supervisor; a money room clerk; two table games supervisors; four bingo callers; four clerks; and one investor.[7] As of

---

**3.** In its desire to afford each side a fair opportunity to fully present its position in this vigorously contested matter, the Court has examined all the materials submitted for its consideration. Accordingly, the Court denies this motion.

**4.** One day prior to the commencement of this action, the Tribe had filed a claim in tribal court seeking termination of the Management Agreement and other relief. *Id.* at 567 n. 3.

**5.** On November 8, 1991, the Executive Director of the National Indian Gaming Commission communicated to the Tribe the results of its informal review of the Tribe's ordinance and application forms. (Exhibit # 2, Defendant's Exhibit List, dated August 7, 1992.) On November

18, 1991, the Tribe posted a notice indicating which employees were required to apply for a gaming license. By November 20, 1991, Tamiami Partners had distributed applications supplied by the Tribe to the employees listed on the notice. On December 17, 1991, through previous arrangements made by Tamiami Partners, over forty Tamiami Partners employees personally submitted their applications to the Tribe's Police Department.

**6.** Ordinance No. 89–09–91, Section 6.

**7.** Although the Tribe stated at the July 24, 1992 hearing that seventeen applications had been approved, the Court can only find evidence of sixteen approvals from the licensing records.

July 24, 1992, fifty-six applications were still pending, including the ninth money room clerk, the controller, an office supervisor, and various other employees and investors.

Tribal Ordinance No. 08–09–91 requires that Tamiami Partners "immediately terminate the employment" of an applicant whose license has been denied.[8] The sudden flurry of license determinations in July, after a seven-month period of inactivity, and the apparent singling-out for denial employees involved in the handling of money, led Tamiami Partners to seek injunctive relief from this Court. Tamiami Partners argued that the Tribe's licensing process constituted a "creative form of self-help" designed to impede Tamiami Partners from operating the gaming enterprise. Tamiami Partners, therefore, prayed that the Court lift its stay, prohibit further license denials, and direct the Tribe to proceed to arbitration on this and other pending disputes.[9]

### THE TEMPORARY INJUNCTION

After the emergency hearing held on July 24, 1992, the Court found that, as a result of the Tribe's licensing process, Tamiami Partners' work force had been decimated and that the working environment for Tamiami Partners' present and prospective employees offered little, if any, job security. Because these circumstances were seriously jeopardizing Tamiami Partners' ability to maintain its work force, the Court concluded that the Tribe's licensing process violated the terms of the stay order by impeding Tamiami Partners' operation of the gaming enterprise. Accordingly, the Court lifted its stay and issued a temporary injunction, which prohibited the Tribe from denying any additional license applications, pending the Court's review of the licensing process.[10]

### THE LICENSING PROCESS

#### 1. Standard of Review:

■ Because the Tribe conducted the licensing process in avowed compliance with one of the provisions of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C.A. § 2710 (West Supp. Pamphlet 1991), the Court views the process as agency action and reviews it under the guidelines of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (West 1977). Section 706(2) provides, in pertinent part, that the Court may hold unlawful and "set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11]

■ Judicial review under Section 706 of the APA should be highly deferential to the agency, with a presumption of administrative regularity. *Organized Fishermen v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). Hence, an "arbitrary and capricious" finding requires that the agency:

Relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [arrived at a deci-

---

As noted below, on one particular applicant, the Agency reversed its initial approval. This may account for the discrepancy.

**8.** Ordinance No. 89–09–91, Section 8.2.2(b).

**9.** Prior to Tamiami Partners' filing of its emergency motion on July 21, 1992, the tribal court had not communicated to Tamiami Partners any ruling on the claim pending before it. On July 23, 1992, however, Tamiami Partners received by facsimile transmission a copy of the tribal court's order, dated July 16, 1992, directing the parties to initiate arbitration proceedings within thirty days in accordance with the Management Agreement provisions. *Miccosukee Tribe of Indians v. Tamiami Partners, Ltd.*, No. CV 92–07 (Miccosukee Tribal Court, July 16, 1992).

**10.** Order on Plaintiff's Emergency Motion, dated July 24, 1992.

**11.** At the emergency hearing held on July 24, 1992, counsel for the Tribe conceded that the Tribe's licensing decisions were not unfettered and that they were subject to review under an "arbitrary and capricious" standard.

sion] so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983)). Where an agency engages in disparate treatment of similarly situated persons, a reviewing court may find such action arbitrary and capricious. *Keen Transport, Inc. v. United States*, 446 F.Supp. 5, 8 (N.D.Ohio 1976) (finding "palpably arbitrary and capricious" the Interstate Commerce Commission's "complete disregard of a uniform policy" in processing carriers' applications). *See also Basic Media, Ltd. v. FCC*, 559 F.2d 830, 833 n. 2 (D.C.Cir.1977) (stressing the need for uniform treatment of similarly situated applicants).

*2. The Tribe's criteria for issuing licenses:*

As noted earlier, IGRA provides a mechanism for weeding-out persons whose prior record or unsavory reputation would lead to unsuitable, unfair, or illegal class II gaming practices.[12] This provision furthers one of Congress' declared legislative policies in enacting IGRA, namely, "to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C.A. § 2702(2) (West Supp. Pamphlet 1991).

As one reason for denial of licenses, therefore, the Tribe's licensing ordinance provides the same unsuitability criteria as IGRA:

> The applicant is a person whose prior activities, including, but not limited to, criminal record, if any, or reputation, habits or associations pose a threat to the public interest or to the effective regulation of gaming, or create or enhance the dangers of unfair or illegal

practices, methods, or activities in the conduct of a gaming enterprise.

Ordinance No. 89–09–91, Section 8.1(a).

The ordinance also provides an alternative basis for license denial, not found in IGRA, where:

> The applicant has failed to comply with the application requirements of Sec. 4.1., or to reveal a fact material to such application, or has furnished any information which is untrue or misleading in connection with such application.

Ordinance No. 89–09–91, Section 8.1.(b).

The application requirements of Section 4.1 include: personal identification; education history; employment history; prior or existing gaming licensing experience; financial statement; military record; arrest record; fingerprints; photograph; applicable fees; authorization and release for background investigation; and such other information that the Tribal Gaming Agency may require. Ordinance No. 89–09–91, Section 4.1.[13]

*3. Application of the "arbitrary and capricious" standard:*

■ In reviewing the Tribe's confidential licensing records, the Court finds that the licensing decisions announced so far meet the arbitrary and capricious standard. Specifically, the Court finds that the Tribe has engaged in disparate treatment of similarly situated individuals, making its proffered explanations for license issuance or denial inconsistent and contradictory. Mindful of the confidential nature of the records, the Court limits itself to pointing out, in general terms, the basis for this conclusion.

Upon reviewing the licensing records, the Court has noted an apparently pre-determined slant that carries through the background summaries, the Chief of Police's recommendations, and the Tribal Gaming Agency's determinations. With one exception, a positive background report resulted in the Chief of Police's recommendation for approval, and the Tribal Gaming Agency's adoption of this recommendation without

---

**12.** *See supra* note 1.

**13.** In his November 8, 1991 letter to the Tribe, the Executive Director of the National Indian Gaming Commission indicated that, based on his informal review, the information being requested by the Tribe appeared appropriate. (Exhibit # 2, Defendant's Exhibit List, dated August 7, 1992.)

discussion.[14]

For applicants who received approval, for example, investigators: down played a shoplifting incident by characterizing it as "suspicion of petit larceny;" justified poor credit histories on the basis of divorce, past drug abuse, inability to pay, and desire to pay, even recommending credit counseling to some of the applicants; justified a false claim of high school graduation on the basis that education information did not include high school, even though copies of high school diplomas were required from other applicants; cited as the explanation for an applicant's failure to disclose outstanding debts that the applicant was not aware of such requirement; permitted an applicant to provide further information on his status as a corporate officer; and generally sought out further information from the applicants when such information was missing.

Conversely, investigators' comments in the background summaries of the applicants who were denied licenses bear a negative coloring. In reviewing these records, the Court repeatedly found that investigators seized on conduct or information problems, which had been treated lightly in the approval cases, and turned them into grounds for license denial. The Chief of Police similarly stressed these problems in his report to the Agency. Moreover, in contrast with the approval recommendations, which passed without discussion, the Agency took up and reviewed each of these negative reports individually, again highlighting defects that it had not even bothered to discuss in the approved applica-

tions. Investigators, for example: characterized a shoplifting incident as an arrest and booking on the charge of grand theft; found fatal an applicant's failure to disclose debts under her maiden name; did not consider information because the applicant had it entered on the back "of the wrong page" of an application; afforded an applicant no opportunity to clarify his status as a corporate officer; complained about an applicant's failure to acknowledge misstatements until "confronted by the investigator;" and generally took pains to point out failures to disclose information, quoting the language in the application requiring such information.

## A WRONG WITHOUT A REMEDY

Although the Court finds the Tribe's licensing process to be arbitrary and capricious under the APA standards, the Court finds that it would be acting contrary to law if it granted Tamiami Partners the remedy it seeks. The following analysis has led the Court to this conclusion.

■ Tamiami Partners brought this action to enforce the arbitration provisions of the Management Agreement and to prevent the Tribe from taking any action to seize or assume control of the gaming enterprise pending arbitration. Through its order compelling arbitration, the tribal court has granted Tamiami Partners part of the relief it sought from this Court.[15] The protective relief sought by Tamiami Partners remains available through the Court's stay, rather than dismissal, of this action pending the outcome of arbitration.[16]

14. The exception was a bingo caller classified as a poor credit risk whose driving license had been suspended on three occasion for failure to pay traffic citations. The investigator advised the applicant to seek credit counseling, characterized the credit history as "questionable" and glossed over the license suspensions, concluding that this information would not affect his position as bingo caller. The Chief of Police recommended approval, essentially repeating the investigators findings and conclusions. After approving this applicant, however, the Agency reversed itself upon counsel's advise that such approval could not be limited to the position of bingo caller absent a revision of the application form.

15. In its July 16, 1992 Order, the tribal court directed the parties to proceed to arbitration. On August 5, 1992, the Tribe notified this Court of its intention to comply with the tribal court order. The tribal court, however, retained jurisdiction over the claim before it, pending the outcome of arbitration, and to hear non-arbitrable claims.

16. In this regard, the Court finds unpersuasive the Tribe's arguments, advanced in its motion to dismiss, that the tribal court's acceptance of jurisdiction and arbitration order oust this Court of jurisdiction in this action. As noted in the Omnibus Order, the Court has federal question jurisdiction to review the tribal court's ex-

In its efforts to trigger this protective relief, Tamiami Partners has characterized the Tribe's licensing process as "creative self-help." The Court concurred with this depiction when it issued the temporary injunction that has preserved the status quo. Closer scrutiny of the issues involved, however, reveals two serious jurisdictional obstacles that prevent the Court from adopting Tamiami Partners' own creative portrayal of the Tribe's licensing process. These problems are: IGRA's lack of a statutory grant of jurisdiction to the district courts for the purpose of reviewing gaming license determinations; and the Tribe's sovereign immunity, which the Tribe has narrowly waived only for purposes of enforcing the terms of the Management Agreement.

*1. IGRA's silence on reviewability of licensing determinations:*

■ A thorough review of the licensing provisions in the Indian Gaming Regulatory Act,[17] its legislative history,[18] and the proposed federal regulations,[19] convince this Court that Congress did not consider the interests of non-Indian parties who choose to invest in Indian gaming. The purpose of IGRA is to benefit Indian tribes; the purpose of IGRA's licensing provisions is to prevent organized crime and other corrupting influences from infiltrating Indian gaming. Period, full·stop. Congress would not have been too far·off the mark if it had borrowed the following subtitle for IGRA from Dante's Inferno: "All hope abandon ye who enter here!"[20]

■ Absent a statutory grant of jurisdiction, the Court finds that it cannot declare unlawful a licensing process that, nevertheless, disturbs its conscience. "The

APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action." *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977). Moreover, although aggrieved individuals might challenge their license denials on due process grounds after exhaustion of tribal remedies,[21] Tamiami Partners has no standing to contest the denial of licenses to particular individuals.

*2. The Tribe's sovereign immunity:*

The Court has noted that the Tribe's narrow waiver of its sovereign immunity is limited to enforcement of the terms of the Management Agreement. The Tribe contends that, in conducting the licensing process, the Tribe is acting as a sovereign, and not as a party to the Management Agreement. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 145–46, 102 S.Ct. 894, 905–06, 71 L.Ed.2d 21 (1982). The Court issued the temporary injunction mindful of this distinction, with which it agreed. Nevertheless, relying on a concurring opinion by Justice Stevens, the Court granted Tamiami Partners prospective equitable relief. *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe*, 498 U.S. 505, —— – ——, 111 S.Ct. 905, 912–13, 112 L.Ed.2d 1112 (1991) (Stevens, J. concurring).

In his *Oklahoma Tax Comm'n* concurrence, Justice Stevens stated:

My purpose in writing separately is to emphasize that the Court's holding in effect rejects the argument that this governmental entity—the Tribe—is completely immune from legal process. By addressing the substance of the Tax

---

ercise of judicial power over non-Indians. *Tamiami Partners*, 788 F.Supp. at 568. Accordingly, the Court denies the Tribe's motion to dismiss.

**17.** P.L. 100–497, 102 Stat. 2467 (1988), *codified at* 25 U.S.C.A. §§ 2701–21 (West Supp. Pamphlet 1991).

**18.** S.R. No. 446, 100th Cong., 2nd Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071–106.

**19.** National Indian Gaming Commission, 57 Fed.Reg. 30,346 (1992) (*to be codified at* 25 C.F.R. §§ 515, 519, 522–24, 556, 558); National

Indian Gaming Commission, 57 Fed.Reg. 30,584 (1992) (*to be codified at* 25 C.F.R. 571, 573, 575, 577).

**20.** Dante, *Divine Comedy*, Inferno, canto III, 1.9, *cited in* John Bartlett, *Familiar Quotations* 140 (15th ed. 1980).

**21.** Ordinance No. 89–09–91, Section 11, provides judicial review of license denials in tribal court. The Court makes no comment on·this process, as the individual applicants are not before it.

Commission's claim for prospective injunctive relief against the Tribe, the Court today recognizes that a tribe's sovereign immunity from actions seeking money damages does not necessarily extend to actions seeking equitable relief. *Oklahoma Tax Comm'n*, at ——, 111 S.Ct. at 913 (Stevens, J. concurring). *Id.* at ——, 111 S.Ct. at 912. The basis for this statement is the following passage from the majority opinion: "Although the doctrine of tribal sovereign immunity applies to the Potawatomis, that doctrine does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes." *Id.* at ——, 111 S.Ct. at 911. Despite its acknowledgment of this obligation, the majority concluded, however, that Oklahoma could not enforce this obligation through the most efficient remedy, a suit against the Tribe, due to the doctrine of sovereign immunity. *Id.* at ——, 111 S.Ct. at 912.

■ The Eleventh Amendment bars suits against states in federal courts.[22] A well-established Eleventh Amendment fiction requires a party to bring federal suits against a state official, rather than the state itself. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This legal fiction extends to suits seeking equitable relief. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam) (The issuance of a mandatory injunction against the State of Alabama was barred by the Eleventh Amendment absent Alabama's consent to the filing of such a suit.).

Scholars and jurists have roundly criticized this mirage, as well as other aspects of Eleventh Amendment jurisprudence. *See e.g. Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 247–302, 105 S.Ct. 3142, 3149, 3178, 87 L.Ed.2d 171 (1985) (Brennan, J. dissenting) (presenting an extraordinarily learned historical analysis of Eleventh Amendment doctrine and concluding that the doctrine, as developed, is pernicious). *See also Oklahoma Tax Comm'n*, 498 U.S.

at ——, 111 S.Ct. at 912 (Stevens, J. concurring) ("In my opinion, all Governments— federal, state, and tribal—should generally be accountable for their illegal conduct."); *Edelman v. Jordan*, 415 U.S. 651, 667, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1974) ("The difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between night and day."). Nevertheless, the United States Supreme Court has extended Eleventh Amendment jurisprudence to cases involving Indian tribes, where its fictions are now firmly entrenched. *See Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir.1991) (An Indian tribe's immunity from suit "extends to suits for declaratory and injunctive relief.") (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)); *Potawatomi Indian Tribe v. Oklahoma Tax Comm'n*, 969 F.2d 943, 947 (10th Cir.1992) (Stating, on remand from the United States Supreme Court, that the "Supreme Court's opinion does not permit the Tax Commission to enforce the Tribe's legal obligation through the federal courts.")

■ Tamiami Partners' forceful argument that the Tribe, the Tribal Gaming Agency, and Tribal officers are one and the same entity with one and the same goal— to oust Tamiami Partners from the gaming enterprise—partakes of the realism found in Justice Stevens and Justice Brennan's opinions. The weight of precedent, however, does not permit this Court to sponsor this assessment. Therefore, having found that the Tribe's narrow waiver of sovereign immunity does not extend to its licensing process, the Court concludes that the Tribe has not consented to federal suits relating to this process. Absent the Tribe's consent, the Court lacks jurisdiction to issue injunctive relief against the Tribe's licensing process in this action. Accordingly, the Court vacates its temporary injunction and

---

**22.** The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

denies Tamiami Partner's emergency motion for a preliminary injunction.

## CONCLUSION

Based on the foregoing considerations, it is hereby

ORDERED AND ADJUDGED that:

(1) The Motion of Miccosukee Tribe for Reconsideration of the Court's July 24, 1992, and Supplemental Memorandum is GRANTED;

(2) The Court's TEMPORARY INJUNCTION prohibiting the Tribe from denying the license applications of Tamiami Partners employees is VACATED;

(3) Tamiami Partners' Emergency Motion for Order Enjoining Tribe from Exercising Self Help to Terminate Management Contract and Supplemental Memorandum in Support of Tamiami Partners, Ltd.'s Motion for Injunctive Relief are DENIED;

(4) The Tribe's Motion to Dismiss is DENIED;

(5) The Tribe's Motion to Strike Affidavit of John Sisto and Portions of Affidavit of David Ingenito is DENIED;  and

(6) This action is STAYED subject to the terms of the Court's Omnibus Order, dated March 5, 1992.

DONE AND ORDERED.