63 F.3d 1030
 TAMIAMI PARTNERS, LTD., By and Through its general partner,
TAMIAMI DEVELOPMENT CORPORATION, Plaintiffs-Appellants,
v.
MICCOSUKEE TRIBE OF INDIANS OF FLORIDA; Business Council of
Miccosukee Tribe of Indians of Florida;
Miccosukee Tribal Gaming Agency;
Miccosukee Tribal Court; et
al., Defendants-Appellees,
TAMIAMI PARTNERS, LTD., By and Through its general partner,
TAMIAMI DEVELOPMENT CORPORATION, Plaintiffs-Appellees,
v.
MICCOSUKEE TRIBE OF INDIANS OF FLORIDA; Business Council of
Miccosukee Tribe of Indians of Florida;
Miccosukee Tribal Gaming Agency;
Miccosukee Tribal Court, Defendants,
Billy Cypress, Jasper Nelson, Jimmie Bert, Max Billie, Henry
Bert, Andy Buster, Minnie Bert, Defendants-Appellants.
TAMIAMI PARTNERS, LIMITED, Plaintiff-Appellant,
v.
MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, Business Council of
the Miccosukee Tribe of Indians, Miccosukee Tribal
Gaming Agency, Miccosukee Tribal Court,
Defendants-Appellees,
Billy Cypress, Jasper Nelson, et al., Defendants.
 Nos. 94-4403, 94-4405 and 94-4578.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 16, 1995.
 
 Sanford L. Bohrer, Miami, FL, F. Lee Bailey, West Palm Beach, FL, for appellants.
 Dexter W. Lehtinen, Samuel B. Reiner, Sonia Escobio O'Donnell, Miami, FL, for appellees.
 Appeals from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, COX, Circuit Judge, and YOUNG*, Senior District Judge.**
 TJOFLAT, Chief Judge:
 
 
 1
 This case arises out of a contractual dispute between the Miccosukee Tribe of Indians of Florida ("the Tribe")[1] and Tamiami Partners, Ltd., the management contractor selected by the Tribe to manage the bingo gaming facility. When efforts to settle the dispute failed, Tamiami brought this action against the Tribe, the Tribe's Business Council and Gaming Agency, and the officers of these tribal entities who are responsible for overseeing the gaming operation (the "individual defendants" or "tribal officers"). The district court dismissed all claims against the Tribe, the Business Council, and the Gaming Agency on the ground that, because the Tribe has not waived its sovereign immunity, these tribal entities are not subject to suit. The court refused to extend the Tribe's sovereign immunity to the individual defendants, however, and denied their motion to dismiss the case.
 
 
 2
 After making these rulings, the district court granted the Tribe, the Business Council, and the Gaming Agency final judgment, pursuant to Fed.R.Civ.P. 54(b), and Tamiami appealed. The individual defendants also appealed, asserting that they are entitled to immediate appellate review of their claim to tribal immunity under the collateral order doctrine established by Cohen v. Beneficial Indust. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
 
 
 3
 We affirm the district court's dismissal of Tamiami's complaint against the Tribe, the Business Council, and the Gaming Agency because the complaint fails to state a claim for relief against them. Furthermore, we affirm the district court's determination that the individual defendants are not shielded by the Tribe's sovereign immunity.
 
 
 4
 This case has a convoluted history. In an earlier appeal, Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 999 F.2d 503 (11th Cir.1993), we remanded the case to the district court with the admonition that, if one of the parties did not replead its case within thirty days, the district court must dismiss the case. Id. at 508. Tamiami repleaded its case, and, in the aftermath of bitter infighting among the parties, the case is here once again.
 
 
 5
 To place the issues presented by these appeals in proper context, we first review the federal statutory scheme under which the Tribe established and currently operates its bingo facility[2] and then review the history of this litigation. Next, we address the questions whether Tamiami has stated a claim for relief against the Tribe, the Business Council, and the Gaming Agency and whether the tribal officers, if they have presented a cognizable appeal under the Cohen doctrine, are entitled to sovereign immunity.
 
 I.
 A.
 
 6
 On October 17, 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. Secs. 2701-2721 (1988) ("IGRA" or "the statute"), a comprehensive statute governing the operation of gaming facilities on Indian lands.[3] For several years prior to the enactment of IGRA, Congress had considered the need for federal legislation to govern the rapidly expanding field of Indian gaming.[4] As stated in the Senate Report submitted with the statute at the time of its passage, "[t]he purpose of the act is to provide a statutory basis for operating Indian gaming to promote economic development, to shield tribes from organized crime, to assure fairness to operators and players, and to establish a Federal regulatory authority for Indian gaming to meet congressional concerns." S.Rep. No. 446, 100th Cong., 2d Sess. 15-16 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3085-86. The legislative history makes clear the purpose and effect of the statute: to protect the Indian gaming industry from corruption and to provide for extensive federal oversight of all but the most rudimentary forms of Indian gaming.[5]
 
 
 7
 The statute affirms tribal sovereignty by noting that "unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities." Id. at 5-6, 1988 U.S.C.C.A.N. at 3075 (emphasis added).[6] The Senate report unequivocally states, however, that IGRA "is intended to expressly preempt the field in the governance of gaming activities on Indian lands." Id. at 6, 1988 U.S.C.C.A.N. at 3076. The occupation of this field by federal law is evidenced by the broad reach of the statute's regulatory and enforcement provisions and is underscored by the comprehensive regulations promulgated under the statute.
 
 B.
 
 8
 IGRA established the National Indian Gaming Commission (the "NIGC" or "Commission"), a three-member body within the Department of the Interior consisting of a Chairman appointed by the President and two associate members appointed by the Secretary of the Interior. See 25 U.S.C. Sec. 2704(a), (b)(1). The statute confers extensive powers upon the Chairman and the Commission.
 
 
 9
 The Chairman's powers, outlined in section 2705 of the statute, include the power to close a gaming facility temporarily,[7] to fine,[8] to approve tribal ordinances and resolutions,[9] and to approve management contracts.[10] The Commission's discretionary powers, outlined in sections 2706(a) and (b), include the power to adopt regulations governing fines,[11] to authorize the Chairman to issue subpoenas,[12] to close a gaming facility permanently,[13] ] to inspect the books and records of a class II gaming facility, and to hold hearings. The Commission must monitor class II gaming continuously, inspect class II gaming premises, promulgate regulations necessary to implement IGRA, and conduct background investigations of, among others, management contractors, such as Tamiami, and their employees. 25 U.S.C. Sec. 2706(b). Pursuant to its mandate to issue regulations, the Commission did so comprehensively. See 25 C.F.R. Secs. 501.1-577.15 (1994).
 
 C.
 1.
 
 10
 Before a tribe may begin to operate an organized gambling facility, IGRA requires that the tribe adopt a tribal ordinance or resolution authorizing and governing gaming on the tribe's reservation. A tribe may "engage in, or license and regulate" class II gaming only if:
 
 
 11
 (A) such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law), and
 
 
 12
 (B) the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman.
 
 
 13
 25 U.S.C. Sec. 2719(b)(1). The Chairman's approval of a tribal ordinance or resolution is contingent upon several factors set forth in the statute and the regulations. For example, the tribe must have "the sole proprietary interest and responsibility for the conduct of any gaming activity," id. Sec. 2710(b)(2)(A),[14] and must provide annual outside audits of the gaming enterprise. Id. Sec. 2710(b)(2)(C).[15]
 
 2.
 
 14
 Section 2710(b)(2)(F) of IGRA, which governs a tribe's licensing of a management contractor and its employees, lies at the center of this controversy between the Tribe and Tamiami. Thus, we examine this statutory provision, and the NIGC's implementing regulations, in detail. The statute requires that the tribe conduct background investigations of "primary management officials and key employees of the gaming enterprise" and maintain ongoing oversight of these officials and employees.[16] 25 U.S.C. Sec. 2710(b)(2)(F)(i). Furthermore, the tribe must institute a system for licensing these individuals and must notify the Commission of the results of background investigations prior to licensing. Id. Sec. 2710(b)(2)(F)(ii). A license may not be issued to any individual who presents "a threat to the public interest or to the effective regulation of gaming." Id. The Commission has "thirty days to notify the Indian tribe of any objections to the issuance of such license." Id. Sec. 2710(c)(1). If the Commission finds that a license has been issued to an official who fails to satisfy the standards set forth in the statute, the Commission "shall suspend such license and, after notice and hearing, may revoke such license." Id. Sec. 2710(c)(2). Significantly, as strongly implied by the statute[17] and expressly stated in the regulations,[18] the right to a hearing concerning licensing vests only upon the receipt of a license. Neither the statute nor the regulations provides for Commission review of a tribe's refusal to issue a license.
 
 
 15
 Furthermore, under the regulations, a tribal ordinance must provide "[a] description of procedures for resolving disputes between the gaming public and the tribe or the management contractor." 25 C.F.R. Sec. 522.2(f). The Commission's regulations do not address whether a tribal ordinance must provide a mechanism for the resolution of a dispute between the tribe and the management contractor. As discussed in section I.D. infra, however, the regulations do require that management contracts entered into after the Commission's promulgation of the rules concerning management contracts--that is, management contracts formed after January 22, 1993--contain provisions for the resolution of such disputes.
 
 3.
 
 16
 IGRA provides that "the Chairman shall approve [an] ordinance or resolution" not later than ninety days after its submission by the tribe "if it meets the requirements of [section 2710 of the statute]."[19] 25 U.S.C. Sec. 2710(e). Existing ordinances and resolutions must also conform to the provisions of IGRA and the Commission's regulations.[20]
 
 
 17
 If the Chairman rejects an ordinance or resolution (new or existing) or an amendment to an existing ordinance or resolution, the tribe has the right to appeal to the full Commission. 25 C.F.R. Sec. 524.1. An entity other than the aggrieved tribe may participate in the tribe's appeal to the limited extent of filing one written submission to the Commission, unless "the Commission determines further participation would substantially contribute to the record." Id. Sec. 524.2. Thus, the regulations provide no means by which a party, other than the tribe, may appeal the Chairman's rejection of a tribal gaming ordinance, resolution, or amendment--a party may only participate once the tribe has made such an appeal.
 
 
 18
 Under section 2714, "[d]ecisions made by the Commission pursuant to sections 2710 ... [and] 2712 ... shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5 [the Administrative Procedure Act]." 25 U.S.C. Sec. 2714.[21]
 
 D.
 
 19
 The Chairman also has responsibility for approving or disapproving management contracts made between Indian tribes and contractors for the purpose of conducting class II gaming. All management contracts, including those--such as the contract involved in this case--previously approved by the Secretary of the Interior, must be approved by the Chairman.[22] Section 2711(a) requires, as a condition of approval, that those individuals forming the proposed management entity provide detailed information, including personal data, previous gaming experience, and extensive financial statements.[23] 25 U.S.C. Sec. 2711(a)(1). The Chairman has authority to "approve a management contract providing for a fee based upon a percentage of the net revenues of a tribal gaming activity if the Chairman determines that such percentage fee is reasonable in light of surrounding circumstances."[24] 25 U.S.C. Sec. 2711(c)(1). Section 2711(e) sets forth specific restrictions on the Chairman's authority to approve a management contract.[25]
 
 
 20
 In addition, section 531.1 of the regulations mandates that contracts not already approved by the Secretary of the Interior as of January 22, 1993--the date the Commission promulgated its management contract regulations--include certain additional mechanisms to, among other things, ensure that all gaming "will be conducted in accordance with [IGRA] and governing tribal ordinance(s)" and to provide a mechanism to resolve disputes, including those between the management contractor and the tribe.[26] See 25 C.F.R. Sec. 531.1(a), (k).
 
 
 21
 Under section 2711(d) of the statute, the Chairman has a maximum of 180 days to determine whether the management contract satisfies the prescribed criteria.[27] Furthermore, IGRA provides that "[t]he Indian tribe may bring an action in a United States district court to compel action by the Chairman if a contract has not been approved or disapproved within the [specified] period." 25 U.S.C. Sec. 2711(d). Section 2714, which permits federal district court review of final agency decisions pursuant to the Administrative Procedure Act, applies to decisions made by the Commission under section 2711.
 
 E.
 
 22
 As discussed in section I.B. infra, the Chairman has broad powers, under section 2713 of the statute and sections 573 and 575 of the regulations, to levy fines and close gaming facilities. If the Chairman imposes either form of penalty, the affected Indian tribe or management contractor has the right to a hearing before the Commission or its appointed designee. 25 U.S.C. Sec. 2713(a)(2), (b)(2); 25 C.F.R. Sec. 577. A final decision of the Commission regarding fines or permanent closure is also "appealable to the appropriate Federal district court" pursuant to the Administrative Procedure Act. 25 U.S.C. Sec. 2713(c).[28]
 
 II.
 A.
 
 23
 On September 25, 1985, the Tribe enacted Ordinance 85-3 (the "1985 Ordinance"), which authorized bingo gaming on its Tribal lands. This ordinance provided that "[t]he Tribe, through its duly constituted officers, may conduct a Bingo game or games on the Reservation either directly or through a qualified Contractor" and that Tribal revenue from the operation of bingo gaming "shall be utilized by the Tribe to promote the health, education and general welfare of its people."[29] Acting pursuant to this ordinance, the Tribe established a bingo facility and entered into an agreement with a "qualified contractor" to operate the facility. The Tribe selected Tamiami Development Corporation ("TDC"), a Florida corporation, as the contractor.
 
 
 24
 On April 7, 1989, the Tribe entered into an agreement (the "Management Agreement" or "Agreement") with TDC to operate a bingo facility under the gaming scheme authorized by the 1985 Ordinance and IGRA. For a fixed percentage of the facility's net bingo revenues, TDC agreed to purchase a parcel of real estate (outside the Miccosukee reservation), convey the parcel to the United States in trust for the Tribe, and then design, construct, and manage the facility. The Management Agreement has a seven-year term and allows TDC, at its option, to renew the Agreement for an additional term of three years.
 
 
 25
 Article 12 of the Agreement, entitled "Disputes--Arbitration," states that "[a]ll disputes, controversies and/or claims arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration." This article includes the method of selecting arbitrators, the procedures for those arbitrators to follow, and states that (unless otherwise provided) the Commercial Arbitration Rules of the American Arbitration Association are to govern any arbitration proceedings.
 
 
 26
 Under Article 23 of the Agreement, entitled "Waiver of Sovereign Immunity,"[30] the Tribe agrees to waive its common law immunity from a suit brought by Tamiami to compel arbitration under Article 12 or to enforce an arbitration award. Article 23 specifies that:
 
 
 27
 The [Tribe] waives its sovereign immunity from suit as expressly provided in this Article. The United States District Court for the Southern District of Florida, shall have jurisdiction over the parties hereto in order to enforce the terms hereof specifically, upon one or both of the following events (i) [Tribe] fails to participate in an arbitration proceeding invoked as provided in Article 12, or (ii) failure by [Tribe] to abide by the terms of an arbitration award.... This waiver of sovereign immunity shall not become effective until Manager has given written notice to the Miccosukee Tribal Business Council, detailing the nature of the complaint and the [Tribe] shall have failed after 30 days following such notice to cure such complaint.
 
 
 28
 As required by IGRA,[31] the Tribe submitted the Management Agreement to the Secretary of the Interior for approval. The Secretary, through a designee, subsequently approved the Agreement.[32]
 
 
 29
 Following the Secretary's approval, TDC purchased a twenty-five acre site in Dade County, Florida and deeded it to the United States in trust for the Tribe; TDC then built the bingo facility. TDC's investment in the land and improvements totalled approximately $6.5 million.
 
 
 30
 On January 23, 1990, again with the Secretary's approval, the parties effected a novation of the Agreement whereby Tamiami Partners, Ltd., a Florida limited partnership, was substituted for TDC. TDC remained associated with the gaming enterprise, however, as Tamiami's general partner. In September 1990, Miccosukee Indian Bingo ("MIB") began operations.
 
 
 31
 On August 9, 1991, the Tribe, carrying out IGRA's mandate,[33] adopted Ordinance No. 08-09-91 (the "1991 Ordinance") to provide for the registration and subsequent licensing of the managers and key employees of its gaming enterprises, including the one managed by Tamiami. The 1991 Ordinance established a Tribal Gaming Agency to oversee the Tribe's gaming operations, including the background investigation and licensing of the managers and key employees. As to each person licensed, the ordinance required the Agency to notify the NIGC of the results of the background investigation.[34] The ordinance gave the Tribe's Chief of Police the responsibility for conducting these background investigations, reporting the investigation results to the Tribal Gaming Agency, and recommending whether a license should issue. Anyone denied a license was given the right to appeal to the Gaming Agency and, if still dissatisfied, to the Tribal Court.[35]
 
 B.
 
 32
 The Tribe made offers to purchase Tamiami's interest in MIB on two separate occasions during the first sixteen months of the bingo facility's operations. The Tribe's first offer was for $2 million less than Tamiami's initial investment in the enterprise; the second offer was for the amount of Tamiami's investment.[36] Tamiami rejected both offers. Thereafter, in a letter dated January 28, 1992, the Tribe notified Tamiami that the Agreement had been "terminated by action of the [Tribe's] Business Council ... effective 30 days from the date hereof, because of repeated and flagrant violations of the letter and spirit of that Agreement." Among other things, the Tribe alleged that Tamiami had: (1) refused to allow Tribal representatives to inspect the business and financial records of the gaming enterprise; (2) impeded the ability of outside accountants to conduct an audit of the enterprise; (3) failed to obtain the Tribe's approval of non-budgeted expenditures; (4) violated the 1991 Ordinance by failing to register its managers and key employees (presumably so that their backgrounds could be investigated and licenses issued); and (5) failed to provide a plan for the preferential employment of Tribal members.
 
 
 33
 Tamiami responded to the Tribe's allegations on February 4, 1992, refuting each of the Tribe's stated reasons for terminating the Agreement and declaring that the termination was "ineffective" and was "a nullity." On February 11, the Tribe acknowledged receipt of Tamiami's response and advised Tamiami that the Agreement had been terminated effective the twenty-eighth of that month.
 
 
 34
 On February 25, pursuant to Article 12 of the Agreement, Tamiami formally demanded arbitration "to determine the validity of the Tribe's purported notice of termination." In its demand letter, Tamiami's attorney gave an interpretation of the dispute and made a request of the Tribe:
 
 
 35
 [T]he Tribe intends to unilaterally settle this matter, even though the parties disagree regarding the merits of the Tribe's claimed right to terminate the Agreement. The Agreement requires that all disputes, controversies and claims under the Agreement be "settled by arbitration," not by unilateral action by one party to the Agreement .... [T]o avoid the extraordinary expense for both parties of filing an action in federal court to protect [Tamiami's] rights, I am also writing to request that the Tribe, without giving up any rights, claims or positions it might have, defer any action on the purported termination until this matter is "settled by arbitration."
 
 
 36
 Tamiami requested that the Tribe respond to its letter by noon the following day.
 
 
 37
 The Tribe did not respond to Tamiami's demand for arbitration; instead, on February 26, it filed a "Statement of Claim" in the Miccosukee Tribal Court (the "tribal suit"). The Tribe alleged that Tamiami, "as manager of [MIB,] has violated federal and state law and tribal ordinances and customs, and a federally approved management agreement to the detriment of the Tribe." The Tribe sought the following relief: (1) a declaration that the Management Agreement had been terminated; (2) an order directing Tamiami to vacate the premises and to give the Tribe control of MIB; (3) an order directing the Tribal police to enforce such order; and (4) attorney's fees and costs.
 
 
 38
 On February 27, Tamiami answered the tribal suit by bringing this action against the Tribe in the United States District Court for the Southern District of Florida. Tamiami's complaint sought an order, under Article 23 of the Agreement, compelling the Tribe to arbitrate the dispute as required by Article 12 of the Agreement[37] and preventing the Tribe from taking control of MIB pending the completion of such arbitration. On February 28, on Tamiami's application, the district court issued a temporary restraining order directing the parties to maintain the status quo.
 
 
 39
 On March 5, 1992, the district court issued the first of two interim "omnibus orders" in the case. Addressing the threshold question of its subject matter jurisdiction, the court concluded that such jurisdiction existed because the case presented the question of the exercise of tribal court power over a non-Indian:
 
 
 40
 [T]his case requires that the [District] Court construe an agreement between Indians and non-Indians that includes a limited waiver of sovereign immunity by the Tribe; and that, on its face, provides for arbitration of all disputes arising from the agreement. The Court must interpret these contractual provisions to determine whether it should compel arbitration, thereby enjoining prosecution of a claim filed by the Tribe in tribal court. The case therefore, presents a federal common law question--the exercise of Tribal Court judicial power over non-Indians. National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 852, 105 S.Ct. 2447, 2451, 85 L.Ed.2d 818 (1985) ("The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under Sec. 1331.")
 
 
 41
 Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 788 F.Supp. 566, 568 (S.D.Fla.1992) (citation omitted). The court, however, citing Iowa Mutual Insurance v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) and National Farmers for the proposition that the federal court should "stay[ ] its hand until after the Tribal Court has had a full opportunity to review its own jurisdiction," National Farmers, 471 U.S. at 857, 105 S.Ct. at 2454, stayed further proceedings in the case pending the parties' exhaustion of their remedies in the Tribal Court. Tamiami, 788 F.Supp. at 570.[38] The district court therefore vacated the February 28 temporary restraining order. The court also indicated that it would lift the stay if: (1) the Tribe, engaging in self-help, attempted "to evict or otherwise impede Tamiami ... from operating the gaming enterprise;" or (2) the Tribe failed to provide Tamiami "with two (2) business days' notice, prior to taking any action [ordered by the] Tribal Court." Id. at 567.
 
 
 42
 On July 3 and July 20, 1992, the Tribe denied two groups of license applications, seventeen in all, that had been submitted by Tamiami employees to the Tribal Gaming Agency the previous December. In the midst of these license denials, the Miccosukee Tribal Court, on July 16, issued its ruling in the tribal suit. After finding that it had jurisdiction to entertain "civil disputes between Indians ... and non-Indians doing business on the Miccosukee Reservation" and that the parties were bound by the arbitration provisions of Article 12 of the Agreement, the Tribal Court directed the parties "to initiate arbitration proceedings in accordance with Articles 12 and 23 of the [Agreement]."[39] The Tribal Court retained jurisdiction, "pending the outcome of the required arbitration, to hear and determine the claims, if any, the Tribe has asserted under its civil governmental powers against [Tamiami] to the extent those claims are not the subject of arbitration under the Agreement."
 
 
 43
 On July 21, after the Gaming Agency had denied the second group of license applications, Tamiami returned to the district court and filed an "Emergency Motion for Order Enjoining Tribe from Exercising Self Help to Terminate Management Contract." See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 803 F.Supp. 401, 403 (S.D.Fla.1992).[40] In its motion, Tamiami alleged that, under the pretext of issuing legitimate license denials, the Tribe had engaged in self-help to prevent Tamiami from operating MIB and effectively to terminate the Management Agreement. On July 24, the district court lifted its stay and issued a temporary injunction that "prohibited the Tribe from denying any additional license applications, pending the Court's review of the licensing process" that the Tribe had established pursuant to IGRA.[41] Id. at 405. On August 5, during a two-day evidentiary hearing before the district court, the Tribe filed in the Tribal Court a notice of compliance with that court's July 16 order compelling arbitration; the notice stated that the Tribe intended to proceed with arbitration.[42]
 
 
 44
 On August 19, 1992, the district court issued its second omnibus order. The court found that the Tribe's licensing process was "arbitrary and capricious," id. at 407, but determined that Congress, in enacting IGRA, had made no provision for suits by management contractors, such as Tamiami, to challenge a tribe's licensing procedures. The court concluded, "Congress did not consider the interests of non-Indian parties who choose to invest in Indian gaming." Id. at 408.[43] Apparently drawing on Congress' failure to allow management contractors the right to mount a judicial challenge to a tribe's licensing decision, the court held that Tamiami could not challenge, in an arbitration proceeding, the Tribe's refusal to license its managers and key employees; the court therefore denied Tamiami's emergency motion for injunctive relief.
 
 
 45
 The district court's continued belief that it had jurisdiction to grant Tamiami protective relief against the Tribe's resort to self-help pending the outcome of the arbitration ordered by the Tribal Court is illustrated by the following passage:
 
 
 46
 Tamiami Partners brought this action to enforce the arbitration provisions of the Management Agreement and to prevent the Tribe from taking any action to seize or assume control of the gaming enterprise pending arbitration. Through its order compelling arbitration, the tribal court has granted Tamiami Partners part of the relief it sought from this Court. The protective relief sought by Tamiami Partners remains available through the Court's stay, rather than dismissal, of this action pending the outcome of arbitration.
 
 
 47
 Id. at 407 (footnotes omitted).
 
 
 48
 On August 21, Tamiami moved the district court for leave to file an amended complaint that sought two coercive orders: (1) an order compelling arbitration of the licensing dispute and (2) an injunction to prevent the Tribe from using the licensing process to frustrate Tamiami's operation of MIB. Assuming that its motion would be granted, Tamiami asked the court to issue these orders immediately in the form of a preliminary injunction. Before the court could respond to Tamiami's request, however, Hurricane Andrew struck south Florida, forcing the temporary closing of MIB and thereby providing a reprieve from the dispute between the parties.
 
 
 49
 On September 15, 1992, the district court denied Tamiami leave to amend its complaint and thus its request for a preliminary injunction. Two days later, Tamiami took interlocutory appeals from the district court's August 19 and September 15 orders. See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 999 F.2d 503, 505 (11th Cir.1993).
 
 
 50
 While those interlocutory appeals were pending, the Tribe took several steps to oust Tamiami from the MIB enterprise. On April 13, 1993, the Tribal Gaming Agency denied licenses to Tamiami and to TDC as well as to two of its principle officers, Cye Mandel and John Sisto. At that time, the Gaming Agency also issued an order appointing a conservator to take control of MIB and to operate the facility. This order was "ratified and confirmed" the same day by the Tribal Court in its "Order in Aid of Enforcement of Tribal Gaming Agency's Order Appointing Conservator." Following the denial of the license applications and the entry of these orders, the Tribal police forced Mandel and Sisto to leave the MIB premises, the MIB accountant surrendered the MIB's financial records to Tribal officials, and the Tribe began the process of obtaining control of MIB's bank accounts.
 
 
 51
 Also on April 13, immediately after Tamiami had been ousted by the Tribe, Tamiami returned to district court seeking an injunctive order to prevent the Tribe from exercising self-help. On April 15, the court held an evidentiary hearing and issued its third omnibus order, holding that the Tribal Court had exceeded its jurisdiction in issuing the order ratifying the Gaming Agency's appointment of a conservator such that the order was null and void. The court also concluded that the Tribe had exceeded its sovereign powers in rejecting, through the Gaming Agency, the license applications of Tamiami, TDC, Mandel, and Sisto. The court viewed these rejections, although made under the guise of the Tribe's sovereign powers, as simply an attempt by the Tribe to circumvent the ongoing arbitration proceedings and to terminate the Management Agreement. In sum, the court invalidated the Tribe's actions of April 13 and ordered the parties to return to the status quo ante of April 12.
 
 
 52
 The Tribe immediately requested that the district court certify its April 15 order under 28 U.S.C. Sec. 1292(b) to allow the Tribe to appeal. The court certified the order, and, on the Tribe's application, we permitted the appeal. We thereafter consolidated the appeal with the two interlocutory appeals taken by Tamiami on September 17, 1992. At the same time, we stayed the district court's third omnibus order pending our disposition of these appeals.
 
 
 53
 On August 16, 1993, a panel of this court decided the three appeals. Tamiami, 999 F.2d 503.[44] Reviewing Tamiami's complaint, the panel held that, under the "well-pleaded complaint rule," Tamiami had failed to state a federal question within the meaning of 28 U.S.C. Sec. 1331. Id. at 507. Instead, Tamiami's allegations established nothing more than the existence of a contract dispute. Id. The court acknowledged that although "[t]he right to be protected against an unlawful exercise of tribal court judicial power [presented] a claim arising under federal law," Tamiami's complaint failed to assert such a right. Id. Although the panel did not elaborate further,[45] it observed that "events had occurred and evidence was in the record that suggested a basis for district court jurisdiction." Id. at 508. Accordingly, the panel reversed the district court's April 15 order, with the following instructions:
 
 
 54
 Because we are now aware of facts which suggest that the district court could have [subject matter] jurisdiction if the case arose today, we remand the case to the district court with directions that the district court dismiss this action unless one of the present parties files a complaint or other pleading which properly alleges jurisdiction. If such a complaint or petition is filed within thirty days of the date of remand, the district court shall proceed to frame and determine the issues in the usual manner.
 
 
 55
 Id. In short, the panel invited Tamiami, or the Tribe, to bring a new suit.
 
 C.
 
 56
 On remand, Tamiami filed an amended complaint on September 14, 1993--the pleading now before us. In addition to the Tribe, Tamiami named as defendants the tribal Business Council, the tribal Gaming Agency, the Tribal Court, and eight individual members of those tribal bodies. In essence, the amended complaint asserted the following bases of federal question jurisdiction: (1) the Tribe's purported termination of the Management Agreement violated IGRA; (2) the Tribe's denial of gaming licenses violated IGRA; (3) individual members of the Business Council and the Gaming Agency had acted outside their lawful authority; and (4) the Tribal Court had exceeded its jurisdiction. Tamiami sought the following declaratory and injunctive relief: First, Tamiami asked the district court to declare invalid the Tribal Court's April 13, 1993 order ratifying the Gaming Agency's appointment of a conservator and the Gaming Agency's refusal to license Tamiami, TDC, Mandel, and Sisto. Second, Tamiami asked the court to return the parties to the status quo as of April 12, 1993--when Tamiami was still operating the gaming enterprise; to issue an injunction against the Tribe to prevent interference with Tamiami's management of the MIB gaming enterprise; and to issue an order forcing the Tribe to turn over Tamiami's forty percent share of the enterprise's net gaming revenues.
 
 
 57
 On September 15, one day after Tamiami filed its amended complaint and five days before a final hearing was to be held before the arbitration panel convened pursuant to the Tribal Court's order of July 16, 1992, the Tribe moved the Tribal Court to stay the arbitration proceedings. The Tribe's asserted reason for seeking the stay was Tamiami's allegation in its amended complaint that the Tribal Court lacked jurisdiction over Tamiami because Tamiami is a non-Indian. If that allegation were true, the Tribe argued, then the Tribal Court had no authority to order the arbitration. On September 16, the Tribal Court granted the motion and stayed the arbitration proceedings pending further order.
 
 
 58
 On September 21, the arbitration panel, concluding that the Tribal Court had no jurisdiction to enforce the arbitration provisions of the Agreement and that the panel's authority derived from Article 12 of the Agreement, disregarded the Tribal Court's September 16 order and declined to postpone the final hearing in the matter, which took place as scheduled on September 23. The Tribe refused to participate in the final hearing, as did the Tribe's chosen arbitrator. On October 6, the arbitration panel handed down its decision,[46] finding in favor of Tamiami and against the Tribe on all claims. The arbitration panel gave the Tribe the choice of reinstating Tamiami to its position as manager of MIB or terminating the Agreement by paying Tamiami $9.5 million. The panel also awarded Tamiami fees and costs.
 
 
 59
 After the arbitration panel's decision, the Tribal Court entered two orders that collectively withdrew it from the controversy. On October 12, 1993, the court vacated its April 13 order, which had ratified the Gaming Agency's appointment of a conservator for MIB; then, on October 25, the court granted the Tribe's motion to dismiss the tribal suit. During this thirteen-day period the Tribal Court moved the district court to dismiss it from the case for want of a justiciable controversy. The Business Council, the Gaming Agency, and the individual defendants also moved for dismissal, contending not only that subject matter jurisdiction was lacking but also that the action was barred by the Tribe's sovereign immunity.
 
 
 60
 On October 26, the district court held a status conference and addressed a number of issues, including Tamiami's request for an order freezing the funds held in the MIB "reserve account." The court granted Tamiami's request and froze the funds.
 
 D.
 
 61
 On February 28, 1994, the district court issued its order on the defendants' motions to dismiss--the order now before us. The court first addressed the Tribal Court's motion to dismiss and, observing that the Tribal Court was no longer exercising jurisdiction over the parties, dismissed as moot Tamiami's claims.
 
 
 62
 As for Tamiami's claims against the Tribe, the Business Council, the Gaming Agency, and the individual defendants, the court held that Tamiami's amended complaint raised a federal question--"namely, whether these defendants exceeded tribal powers in their actions towards [Tamiami]." The court then addressed whether, as the defendants contended, the Tribe's sovereign immunity barred the suit, and concluded that Tamiami's claims against the Tribe, the Business Council, and the Gaming Agency were barred because the Tribe had not clearly waived its sovereign immunity and Congress had not abrogated such immunity from suits based on federal common law. Accordingly, the court dismissed with prejudice Tamiami's claims against the Tribal entities.
 
 
 63
 The individual defendants, however, were not shielded by the Tribe's sovereign immunity. Citing numerous cases applying the rationale of Ex Parte Young to Indian sovereign immunity, the court held that the individual defendants were subject to suit given Tamiami's allegation that they "have acted beyond the authority that the Tribe is capable of bestowing upon them under federal laws defining the sovereign powers of Indian tribes." See Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that a suit against an individual in his official governmental capacity--claiming that the individual is acting beyond his authority--is not a suit against the sovereign). Moreover, the court held that Tamiami was not required to exhaust its Tribal Court remedies against these defendants because Tamiami had alleged "bad faith" on the part of the individual defendants and, thus, had established an exception to the exhaustion rule under National Farmers.[47] Therefore, the court denied the individual defendants' motion to dismiss.[48]
 
 E.
 
 64
 On March 28, 1994, in No. 94-4403, Tamiami appealed the portion of the district court's February 28 order dismissing its suit against the Tribe, the Business Council, the Gaming Agency, and the Tribal Court. The following day, in No. 94-4405, the individual defendants appealed the portion of the February 28 order rejecting their claim of tribal sovereign immunity.
 
 
 65
 On April 29, in appeal No. 94-4403, we asked the parties to brief the question whether the portions of the district court's February 28 order being challenged were appealable because the order disposed of fewer than all of the claims in suit and thus did not appear to be a final judgment under 28 U.S.C. Sec. 1291. Tamiami responded by moving the district court to enter final judgment pursuant to Fed.R.Civ.P. 54(b) on its claims against the Tribal entities. The court granted Tamiami's motion and on May 19 entered final judgment as to those claims. On May 20, in No. 94-4578, Tamiami appealed that final judgment; this appeal supersedes the appeal in No. 94-4403, which we dismiss for want of jurisdiction. Pending before this court, therefore, are the appeals in Nos. 94-4405 and 94-4578, which we have consolidated.[49]
 
 III.
 A.
 
 66
 Before we consider whether Tamiami's amended complaint presents a claim for relief against any of the defendants in this case, we must first address a threshold question: whether the district court had subject matter jurisdiction to entertain any of Tamiami's claims as those claims stood on February 28, 1994, the day the district court dismissed them. At that time, there were live controversies between Tamiami and, respectively, the Tribe, the Business Council, the Gaming Agency, and the individual defendants.[50] We briefly describe these claims.[51]
 
 
 67
 Tamiami's first claim is a breach of contract claim against the Tribe. Tamiami contends that the Tribe, operating through its Business Council and the Gaming Agency, has breached the Management Agreement by ousting Tamiami from the MIB premises and taking control of the gaming enterprise.[52] Tamiami seeks an injunction restoring its position as the MIB operator[53] and requiring the Tribe to give Tamiami its forty percent share of MIB's net gaming revenues.[54]
 
 
 68
 Tamiami's second claim is brought under IGRA and the NIGC's regulations against the Tribe and the Gaming Agency. Tamiami contends that the Tribe, through its Gaming Agency, has abused the licensing authority conferred by the statute and the regulations by refusing to license Tamiami, TDC, Mandel, and Sisto. Tamiami seeks an order declaring such an abuse of authority and enjoining the Gaming Agency to issue the requested licenses.[55] Although IGRA does not expressly provide a right of action for such relief, Tamiami contends that such a right of action is implicit under IGRA's regulatory scheme.[56]
 
 
 69
 Tamiami's third and final claim is brought under IGRA and the NIGC's regulations against the individual defendants collectively as members of both the Business Council and the Gaming Agency.[57] Tamiami contends that these individual tribal members are executing the Tribe's plan to assume permanent control of the gaming enterprise by refusing to license Tamiami's managers and key personnel and that, as a result, these individuals are subject to suit under IGRA in the district court.[58] Tamiami seeks an injunction ordering these defendants to grant the licenses at issue, to restore Tamiami to the MIB premises, and to turn over Tamiami's share of the net gaming revenues.
 
 
 70
 As explained below, each of Tamiami's claims, as we have cast them, "aris[es] under the ... laws ... of the United States," 28 U.S.C. Sec. 1331. We first consider Tamiami's claim that the Tribe, operating through its Business Council and the Gaming Agency, has breached the Management Agreement. The Agreement incorporates--by operation of law if not by reference--the provisions of IGRA and the NIGC's regulations that govern MIB's operations.[59] Among the incorporated provisions are those relating to the Tribe's licensing of the managers and key employees designated by Tamiami from time to time to operate the gaming facility.[60] According to Tamiami, such provisions impose upon the Tribe the obligation to process the applications of Tamiami's managers and key employees in good faith. The gravamen of Tamiami's contract claim is that the Tribe, acting through the Gaming Agency, has failed to act in good faith; instead, the Gaming Agency, abusing its licensing authority, has rejected these applications for the sole purpose of taking over the gaming facility. Tamiami's claims that the Tribe has an obligation under IGRA and the NIGC's regulations--which the Agreement incorporates--to process an application for a license in good faith and that the Tribe has breached that obligation are claims arising under federal law; hence the district court had subject matter jurisdiction over Tamiami's breach of contract claim against the Tribe.[61]
 
 
 71
 It is also clear that the district court had subject matter jurisdiction over Tamiami's second and third claims, which are based directly on IGRA and the NIGC's regulations. That, as we conclude in subsection III.B.1.b. infra, IGRA does not provide--either expressly or impliedly--the cause of action Tamiami alleges in its second claim did not defeat the district court's jurisdiction under 28 U.S.C. Sec. 1331 "[f]or it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).[62]
 
 B.
 
 72
 Having concluded that the district court had subject matter jurisdiction over Tamiami's claims, we turn to the question posed by appeal No. 94-4578: whether the district court properly dismissed Tamiami's claims against the Tribe.[63] We then consider appeal No. 94-4405 brought by the individual defendants, the members of both the Business Council and the Gaming Agency, challenging the district court's ruling that they are not shielded from suit by the Tribe's sovereign immunity.[64]
 
 1.
 
 73
 The district court dismissed all of Tamiami's claims against the Tribe on the ground of sovereign immunity. We agree that the doctrine of sovereign immunity bars Tamiami's first claim for breach of contract. We do not agree, however, that the doctrine bars Tamiami's second claim alleging violations of IGRA and the NIGC's regulations. We dispose of that claim on the separate ground that, because IGRA provides Tamiami no right of action, Tamiami has failed to state a claim for relief.
 
 
 74
 a.
 
 
 75
 Tamiami's breach of contract claim is barred by the doctrine of sovereign immunity unless the Tribe, by the very act of entering into the Management Agreement and engaging in the gaming enterprise, waived its immunity from suit by Tamiami or Congress, by enacting IGRA, abrogated that immunity. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) ("Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation."). Nothing in IGRA indicates that Congress abrogated the sovereign immunity of tribes that elect to engage in class II gaming; therefore, IGRA provides Tamiami no comfort. This is not to say, however, that Congress foreclosed the possibility that a management contractor might be able to sue a tribe for breach of a management agreement. Indeed, Congress contemplated that disputes between the tribe and its management contractor might arise and that the management contractor, in negotiating the parties' agreement, would insist on the tribe's waiver of its sovereign immunity so that disputes could be settled in a neutral forum rather than in a tribal court. Accordingly, Congress mandated that every management contract contain "grounds and mechanisms for terminating such contract," 25 U.S.C. Sec. 2711(b)(6); the Commission's regulation implementing this provision requires that the contract "[c]ontain a mechanism to resolve disputes between ... [t]he management contractor and the tribe." 25 C.F.R. Sec. 531.1(k)(2).
 
 
 76
 In the instant case, the parties agreed, in Article 12 of the Management Agreement, that "[a]ll disputes, controversies and/or claims arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration, as set forth in this Article 12." To provide an effective means of enforcing this arbitration provision, the parties agreed in Article 23 that the Tribe would waive its sovereign immunity and permit Tamiami to bring an action in the United States District Court for the Southern District of Florida to compel the Tribe to arbitrate and to enforce any resulting award.[65]
 
 
 77
 Tamiami's first claim, however, is simply a breach of contract claim for which it seeks money damages and injunctive relief; Tamiami does not seek arbitration of the dispute at hand or the enforcement of an arbitration award, the type of relief contemplated by Article 23.[66] In sum, because the Article 23 waiver does not embrace Tamiami's first claim, the district court properly dismissed it.[67]
 
 
 78
 b.
 
 
 79
 Tamiami's second claim--that the Tribe, operating through its Gaming Agency, has refused to issue licenses in violation of the statute and regulations--fails because IGRA provides it no right to relief. This result should come as no surprise; as the Supreme Court has observed, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (citation and internal quotations omitted).
 
 
 80
 As an initial matter, we find nothing in IGRA's language that would give a management contractor the express right to compel an Indian tribe to license the employees the contractor designates to operate the gaming facility. The only express right of action Congress gave management contractors is the right to seek judicial review in district court, under the Administrative Procedure Act, of some Commission decisions that adversely affect the contractor.[68]
 
 
 81
 Furthermore, after examining the IGRA regulatory scheme, we find nothing in the statute's language, or in the legislative history, to indicate that Congress implied the right of action Tamiami presents as its second claim for relief. Congress, however, did provide other private rights of action and did so explicitly. See id. at 572, 99 S.Ct. at 2487 ("Obviously, then, when Congress wished to provide a private ... remedy, it knew how to do so and did so expressly."). In addition to giving management contractors the right to challenge some Commission decisions, as indicated above, Congress provided express rights of action for other aggrieved parties. For instance, section 2711 of the statute, the very section authorizing and providing for Commission approval of management contracts, states that "[t]he Indian tribe may bring an action in a United States district court to compel action by the Chairman [of the NIGC] if a contract has not been approved or disapproved within the period required by this subsection."[69] In addition, section 2714 expansively provides that "[d]ecisions made by the Commission pursuant to sections 2710 ["Tribal gaming ordinances"], 2711 ["Management contracts"], 2712 ["Review of existing ordinances and contracts"], and 2713 ["Civil penalties"] of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court" under the Administrative Procedure Act.[70] In the face of these express rights of action, we adhere to "[a] frequently stated principle of statutory construction[:] when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." National R.R. Passenger Corp. v. Nat'l Assoc. of R.R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Accordingly, we decline Tamiami's invitation to read into IGRA the right of action Tamiami asserts as its second claim.
 
 2.
 
 82
 Having disposed of appeal No. 94-4578, we now turn to No. 94-4405, the interlocutory appeal brought by the members of the Tribe's Business Council and Gaming Agency. As noted in section II.E. supra, this appeal challenges the portion of the district court's February 28, 1994 order rejecting the tribal officers' claim of tribal sovereign immunity and denying their motion to dismiss the suit as to the claims against them.
 
 
 83
 Tamiami seeks injunctive relief against these defendants in their official capacities in the form of an order requiring them to comply with the provisions of IGRA and the NIGC regulations relating to the licensing of the employees whom the management contractor has selected to operate the MIB facility.[71] According to Tamiami, the individual defendants have wilfully disregarded these provisions and have refused to license these employees in furtherance of the Tribe's scheme to take over the gaming enterprise.
 
 
 84
 The question this appeal presents is whether the district court properly applied the Ex Parte Young doctrine in refusing to dismiss the tribal officers. Before addressing this question, however, we must decide whether the district court's denial of immunity is appealable under the Cohen collateral order doctrine. We hold that it is.
 
 
 85
 a.
 
 
 86
 To be immediately appealable under Cohen, the order at issue must: "(i) 'conclusively determine the disputed question,' (ii) 'resolve an important issue completely separate from the merits of the action,' and (iii) 'be effectively unreviewable on appeal from a final judgment.' " Swint v. City of Wadley, 51 F.3d 988, 1002 (11th Cir.1995) (quoting Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 431, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985)). In Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2814-15, 86 L.Ed.2d 411 (1985), decided two days after Richardson-Merrell, the Supreme Court treated the third of these elements as the predominant one. "In discussing [the third Cohen factor], the Supreme Court emphasized that qualified immunity is an 'immunity from suit rather than a mere defense to liability' and is 'effectively lost if a case is erroneously permitted to go to trial.' " Griesel v. Hamlin, 963 F.2d 338, 340 (11th Cir.1992) (per curiam) (quoting Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815).
 
 
 87
 In Griesel, this court, following Mitchell's guidance, posed the question "whether the state sovereign immunity under Georgia law is an immunity from suit rather than simply a defense to substantive liability." 963 F.2d at 340. After examining Georgia law, we concluded that "a suit cannot be maintained against the State without its consent." Id. Thus, we applied the collateral order doctrine and found jurisdiction. Likewise, to determine whether we have jurisdiction to entertain the tribal officers' appeal, we must ask a straightforward question: Does tribal sovereign immunity under federal law provide immunity from suit or is it merely a defense to liability? The Supreme Court has unequivocally answered this question, having held that, absent explicit congressional abrogation or a tribal waiver, tribal sovereign immunity provides an Indian tribe with immunity from suit. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Tribal sovereign immunity would be rendered meaningless if a suit against a tribe asserting its immunity were allowed to proceed to trial. Thus, under the Mitchell and Griesel analysis, the collateral order doctrine of Cohen is satisfied, and we have jurisdiction to entertain the tribal officers' appeal. See Seminole Tribe v. Florida, 11 F.3d 1016, 1021 (11th Cir.1994) ("Our jurisdiction ... arises from the district court's denial of defendants' motion to dismiss based on sovereign immunity; such a denial grants defendants the right of an immediate interlocutory appeal."), cert. granted, --- U.S. ----, 115 S.Ct. 932, 130 L.Ed.2d 878 (1995).
 
 
 88
 b.
 
 
 89
 Having determined that we have jurisdiction to hear the tribal officers' appeal, we consider the district court's refusal to dismiss them from this suit. The district court rejected the tribal officers' claim of immunity under the doctrine of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See supra section I.D. That doctrine, as the district court properly concluded, applies in suits brought against tribal authorities in their official capacities. Santa Clara Pueblo, 436 U.S. at 59, 98 S.Ct. at 1677; see also Puyallup Tribe, Inc. v. Department of Game, 433 U.S. 165, 173, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977) ("[T]he [tribe's] successful assertion of tribal sovereign immunity in this case does not impair the authority of the state court to adjudicate the rights of the individual defendants over whom it properly obtained personal jurisdiction."); Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community, 991 F.2d 458, 460 (8th Cir.1993) ("Ex Parte Young applies to the sovereign immunity of Indian tribes, just as it does to state sovereign immunity."); United States v. James, 980 F.2d 1314, 1319 (9th Cir.1992) ("Tribal immunity does not extend to the individual members of the tribe."), cert. denied, --- U.S. ----, 114 S.Ct. 119, 126 L.Ed.2d 84 (1993). Accordingly, we affirm the district court's ruling that the individual defendants are not shielded by the Tribe's sovereign immunity.[72]
 
 IV.
 
 90
 In conclusion, we DISMISS appeal No. 94-4403 for want of jurisdiction. In appeal No. 94-4578, we AFFIRM the district court's dismissal of Tamiami's claims against the Tribe, the Business Council, the Gaming Agency, and the Tribal Court. In appeal No. 94-4405, we AFFIRM the district court's order denying the individual defendants' motion to dismiss on grounds of sovereign immunity.
 
 
 91
 IT IS SO ORDERED.
 
 
 
 *
 Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 **
 Judge Young heard oral argument but did not participate in this decision. This decision is rendered by quorum. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The Tribe is a federally recognized Indian tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. Secs. 461-479 (1988)
 
 
 [2]
 We review the statutory scheme in considerable detail in part I infra because a full understanding of the scheme is necessary to a resolution of Tamiami's appeal of the district court's final judgment dismissing its claims against the Tribe, the Business Council, and the Gaming Agency in No. 94-4578. Moreover, throughout this litigation the parties have consistently ignored the relevant provisions of the statute and implementing regulations
 
 
 [3]
 IGRA divides Indian gaming into three categories: class I, class II, and class III. Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. Sec. 2703(6); class II gaming primarily consists of "the game of chance commonly known as bingo ... including ... pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo ...," id. Sec. 2703(7)(A); class III gaming "means all forms of gaming that are not class I gaming or class II gaming," id. Sec. 2703(8), and thus includes slot machine, parimutuel, and casino gaming
 Because this appeal concerns only class II gaming, we make reference to the other classes only as is necessary to facilitate our discussion of the issues before this court.
 
 
 [4]
 Congress supported its enactment of the statute with the following findings:
 (1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;
 (2) Federal courts have held that section 81 of [Title 25] requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;
 (3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;
 (4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and
 (5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.
 Id. Sec. 2701.
 
 
 [5]
 "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this chapter." 25 U.S.C. Sec. 2710(a)(1)
 
 
 [6]
 The requirement of affirmative election of "State laws and State jurisdiction" anticipates that tribes could elect to be subject to state jurisdiction pursuant to a Tribal-State compact negotiated for the purpose of instituting class III gaming on Indian lands. See 25 U.S.C. Sec. 2710(d)
 
 
 [7]
 Section 2713(b) provides that:
 (1) The Chairman shall have power to order temporary closure of an Indian game for substantial violation of the provisions of this chapter, of regulations prescribed by the Commission pursuant to this chapter, or of tribal regulations, ordinances, or resolutions ....
 (2) Not later than thirty days after the issuance by the Chairman of an order of temporary closure, the Indian tribe or management contractor involved shall have a right to a hearing before the Commission to determine whether such order should be made permanent or dissolved. Not later than sixty days following such hearing, the Commission shall, by a vote of not less than two of its members, decide whether to order a permanent closure of the gaming operation.
 
 
 [8]
 Section 2713(a) dictates that:
 (1) Subject to such regulations as may be prescribed by the Commission, the Chairman shall have authority to levy and collect appropriate civil fines, not to exceed $25,000 per violation, against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of any provision of this chapter, any regulation prescribed by the Commission pursuant to this chapter, or tribal regulations, ordinances, or resolutions ....
 (2) The Commission shall, by regulation, provide an opportunity for appeal and hearing before the Commission on fines levied and collected by the Chairman.
 The regulations governing appeals, as promulgated by the Commission, are discussed in section I.E. infra.
 
 
 [9]
 Section 2710, which governs the Chairman's approval of ordinances and resolutions, is discussed in detail in section I.C. infra
 
 
 [10]
 Section 2711, which governs the Chairman's approval of management contracts, is discussed in detail in section I.D. infra
 
 
 [11]
 See supra note 8
 
 
 [12]
 Section 2715(a) specifies that:
 [T]he Commission shall have the power to require by subpoena the attendance and testimony of witnesses and the production of all books, papers, and documents relating to any matter under consideration or investigation....
 Section 2715(c) instructs that:
 Any court of the United States within the jurisdiction of which an inquiry is carried on may, in case of contumacy or refusal to obey a subpoena for any reason, issue an order requiring such person to appear before the Commission ... and give evidence concerning the matter in question and any failure to obey such order of the court may be punished by such court as a contempt thereof.
 
 
 [13]
 See supra note 7
 
 
 [14]
 The statute further orders that net revenues be distributed for the benefit of one or more of the following: the tribe, tribal members, tribal government, tribal economic development, charitable organizations, or local government agencies. Id. Sec. 2710(b)(2)(B)
 An exception to the "sole proprietary interest" requirement of Sec. 2710(b)(2)(A) is allowed if the tribe wishes to license a "person or entity other than the Indian tribe" provided that the licensee agrees to conform with Sec. 2710(b)(2)(B)(i)'s requirement that net revenues be distributed "to fund tribal government operations or programs." Id. Sec. 2710(b)(4)(A).
 
 
 [15]
 IGRA also requires independent audits of "all contracts for supplies, services, or concessions for a contract amount in excess of $25,000 annually ... relating to such gaming." 25 U.S.C. Sec. 2710(b)(2)(D). In addition, the construction, maintenance, and operation of gaming facilities must not present a threat to the environment or to public health and safety. Id. Sec. 2719(b)(2)(E)
 
 
 [16]
 The NIGC Chairman's approval of a tribal ordinance is contingent upon the existence of tribal procedures that ensure adequate background investigations. See id. Sec. 2710(b)(2)(F); 25 C.F.R. Sec. 522.2(b)
 
 
 [17]
 Section 2710(c)(2) states:
 If, after the issuance of a gaming license by an Indian tribe, reliable information is received from the Commission indicating that a primary management official or key employee does not meet the standard established [to pass a background investigation], the Indian tribe shall suspend such license and, after notice and hearing, may revoke such license.
 
 
 [18]
 The regulations provide that the Commission shall notify the tribe that issued a gaming license if the recipient of that license is unsuitable because of criminal history, reputation, or the like. 25 C.F.R. Sec. 558.5. The tribe must then suspend the license and hold a hearing on the proposed revocation of the license. 25 C.F.R. Sec. 558.5(c). The revocation decision lies solely with the tribe, which "shall notify the Commission of its decision." Id. Sec. 558.5(d). Section 558.1(d) states that "[a] right to a hearing under Sec. 558.5 of this part shall vest only upon receipt of a license granted under an ordinance approved by the Chairman."
 
 
 [19]
 If the Chairman has not acted by the end of the ninety-day period, the ordinance or resolution "shall be considered to have been approved by the Chairman, but only to the extent such ordinance or resolution is consistent with the provisions of this chapter." 25 U.S.C. Sec. 2710(e)
 
 
 [20]
 In accordance with Sec. 2712 of the statute and Sec. 523.2 of the regulations, an Indian tribe must, within 60 days of notification by the Chairman, submit for the Chairman's review any ordinance or resolution adopted prior to October 17, 1988, the effective date of the statute. See 25 U.S.C. Sec. 2712(a); 25 C.F.R. Sec. 523.2. The Chairman then has ninety days to review the ordinance or resolution and, if it conforms with the requirements of Sec. 2710(b) of the statute and Sec. 522 of the regulations, discussed in subsections I.C.1. & I.C.2. supra, the Chairman shall approve it. 25 U.S.C. Sec. 2710(b)(2); 25 C.F.R. Sec. 523.3(a). If the ordinance or resolution does not meet these requirements, the Chairman must notify the tribe of the necessary modifications, and the tribe has 120 days to achieve compliance. 25 U.S.C. Sec. 2712(b)(3); 25 C.F.R. Sec. 523.3(b), (c). Under Sec. 523.4 of the regulations, a tribe must submit any amendments of an existing ordinance to the Chairman, who then has 90 days to determine whether the amendment satisfies the requirements of the statute and the regulations. 25 C.F.R. Sec. 523.4
 
 
 [21]
 Section 2714 also applies to Commission decisions made pursuant to Sec. 2711 and Sec. 2713. See 25 U.S.C. Sec. 2714; infra sections I.D. and I.E
 
 
 [22]
 As with existing ordinances, discussed in subsection I.C.3. supra, IGRA and its implementing regulations provide for the Chairman's review of management contracts made prior to October 17, 1988, the effective date of the statute. Under Sec. 2712, after notification by the Chairman, a tribe or management contractor must provide such contract for review. If the contract complies with the provisions of Sec. 2711, the Chairman shall approve it; if it does not comply, the parties must make the necessary modifications within the prescribed time limits. See 25 U.S.C. Sec. 2712(c)
 Because Sec. 2709 provides that the Secretary of the Interior would continue to regulate gaming until the Commission became functional, any management agreement approved by the Secretary after enactment of IGRA but before the Commission's organization would not be subject to the requirements of Sec. 2712. This gap in the statute appears to have been addressed by the NIGC regulations, which state:
 A tribe or a management contractor shall submit a management contract to the Chairman for review as follows:
 (a) Contracts approved by the Secretary, within sixty (60) days after a request by the Chairman....
 (b) All other contracts, upon execution.
 
 
 [25]
 C.F.R. Sec. 533.2. Thus, under the regulations, the Chairman has discretion to determine whether contracts approved by the Secretary after October 17, 1988 should be submitted to him for review. See United States ex rel. Mosay v. Buffalo Bros. Management, Inc., 20 F.3d 739, 744 (7th Cir.1994) (noting the "anomaly" created by Sec. 2712), cert. denied, --- U.S. ----, 115 S.Ct. 185, 130 L.Ed.2d 119 (1994)
 
 
 [23]
 Under Sec. 2711(b), "[t]he Chairman may approve any management contract entered into pursuant to this section" only if he finds that the contract provides for: (1) adequate accounting procedures and financial reports; (2) tribal access to the daily operation of the gaming in order to verify revenue and income; (3) minimum guaranteed payments to the tribe; (4) a ceiling for the repayment of development costs; (5) a contract term length not exceeding prescribed maximums; and (6) grounds and mechanisms for terminating the contract. 25 U.S.C. Sec. 2711(b). Section 531.1 of the regulations contains specific provisions related to each of these statutory requirements
 
 
 [24]
 The regulations set the maximum percentage at "[n]ot more than forty (40) percent of the net revenues if the Chairman is satisfied that the capital investment required and income projections" favor such an arrangement. 25 C.F.R. Sec. 531.1(i)(2)
 
 
 [25]
 The Chairman shall not approve the contract if any person in the management group, or any person with a financial interest in the management group, is an elected member of the tribe; has been or is later convicted of a felony or gaming offense; has knowingly or willfully provided materially false background information; or poses a threat to the fair, effective, and legal operation of the gaming enterprise. 25 U.S.C. Sec. 2711(e)(1). Furthermore, the Chairman shall not approve the contract if "the management contractor has, or has attempted to, unduly interfere or influence for its gain or advantage any decision or process of tribal government relating to the gaming activity," id. Sec. 2711(e)(2); if "the management contractor has deliberately or substantially failed to comply with the terms of the management contract or the tribal gaming ordinance or resolution adopted and approved pursuant to this chapter," id. Sec. 2711(e)(3); or if "a trustee, exercising the skill and diligence that a trustee is commonly held to, would not approve the contract." Id. Sec. 2711(e)(4). These statutory standards for disapproval of management contracts are essentially duplicated in the regulations. See 25 C.F.R. Sec. 533.6(b)
 
 
 [26]
 Section 531.1 also calls for contractual provisions that delegate responsibilities to each of the parties for various gaming functions, govern assignments and subcontracts (if permitted), determine the effect of ownership changes, and state that the contract is only effective upon approval by the Chairman. See 25 C.F.R. Sec. 531.1(b), (l )-(n)
 
 
 [27]
 The time period for approval or disapproval may be extended by 90 days if the Chairman provides the reason for the delay, in writing, to the tribe. 25 U.S.C. Sec. 2711(d)
 
 
 [28]
 Section 2714, discussed in subsection I.C.3. supra, serves as a second source of authority for such appeal
 
 
 [29]
 After Congress enacted IGRA in 1988, the Tribe amended the 1985 Ordinance, adding references to the statute and amending certain provisions of the ordinance to conform to IGRA. The record does not reveal whether the 1985 Ordinance was amended before or after the execution of the management agreement involved in this case
 
 
 [30]
 Absent tribal waiver or congressional abrogation, an Indian tribe is shielded from suit by sovereign immunity. "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But without congressional authorization, the Indian Nations are exempt from suit." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978) (citations and internal quotations omitted). However, "because of the peculiar 'quasi-sovereign' status of the Indian tribes, the Tribe's immunity is not congruent with that which the Federal Government, or the States, enjoy." Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986)
 
 
 [31]
 See supra note 22
 
 
 [32]
 The Tribe and TDC made their agreement prior to the organization of the three-member Commission. The Commission was fully constituted in April 1991, after the Secretary of the Interior had appointed two Commissioners, and the Senate had confirmed the Chairman. The Commission promulgated its regulations throughout 1992 and 1993, the majority of the regulations being issued on January 22, 1993. Consequently, under section 2709 of the statute, at the time the Agreement was reached, the Secretary of the Interior (or the Secretary's designee) held the authority to approve the Agreement
 
 
 [33]
 See supra subsection I.C.1
 
 
 [34]
 This provision was required by 25 U.S.C. Sec. 2710(b)(2)(F). See supra subsection I.C.2
 
 
 [35]
 In the fall of 1991, the Tribe submitted the 1991 Ordinance to the NIGC with a request that the Commission "provide a written analysis as to whether these items meet the regulatory requirements of the IGRA." In its letter of response, the Commission noted that it had not yet promulgated regulations prescribing precise standards for licensing and, therefore, could not provide a definitive response. Nevertheless, the Commission commented that "[t]he information being requested appears to be within the scope of the Tribe's authority to require," and "[t]he information requirements imposed appear not to be in conflict with the requirements of the IGRA and should provide much of the information necessary to conduct the background investigations and make the required determinations as to suitability for employment."
 As with preexisting management agreements, discussed supra note 22, the provisions of IGRA dealing with the Chairman's approval of preexisting ordinances do not address the procedures for approving ordinances made after enactment of IGRA but before the Commission began to function. Technically, the Tribe should have submitted the 1991 Ordinance to the Secretary of the Interior for approval. See supra note 22; see also 25 U.S.C. Sec. 2709. Given the Commission's response to the Tribe's letter, however, it appears that the 1991 Ordinance was valid. Section 2710(e) of the statute, which states that any ordinance not approved by the Chairman within 90 days of submission "shall be considered to have been approved by the Chairman, but only to the extent such ordinance or resolution is consistent with the provisions of [IGRA]" supports this conclusion.
 
 
 [36]
 The Tribe's two offers are described in Tamiami's amended complaint. The Tribe's answer to that complaint denied that it had made any such offers. The materials in the record suggest that the offers were made as alleged. Whether this is so, however, has no bearing on the decision we reach today
 
 
 [37]
 Tamiami abandoned its request for an order to compel arbitration when it filed its amended complaint on September 14, 1993. See infra section II.C & subsection III.B.1.a
 
 
 [38]
 It appears from the passages of the district court's first omnibus order quoted in the text that the district court misread Tamiami's claim for relief and thus misapplied National Farmers. In National Farmers, a tribal court awarded an Indian schoolchild a money judgment by default against a non-Indian school district that was insured by National Farmers Union Insurance Companies. The tribal court was preparing to issue a writ of execution, which National Farmers would have to satisfy. Contending that the judgment was invalid because the tribal court lacked jurisdiction to enter a money judgment against the non-Indian school district, National Farmers sought a federal district court order enjoining the execution of the writ. The district court had subject matter jurisdiction of the case under 28 U.S.C. Sec. 1331 because the gravamen of National Farmers' complaint was that the tribal court's judgment was invalid as a matter of federal common law. The district court issued the injunction. On certiorari, the Supreme Court held that, although the district court had jurisdiction to entertain National Farmers' claim, the court should have stayed its hand to give the tribal court an opportunity to determine whether it had jurisdiction to entertain the Indian schoolchild's suit against the non-Indian school district. The tribal court could make such determination on a motion by National Farmers to set aside the default judgment and dismiss the suit
 Tamiami's complaint against the Tribe did not allege that the Tribal court, lacking subject matter jurisdiction, was about to enter a judgment against Tamiami and that, unless the Tribal Court were enjoined, the judgment would issue and Tamiami would suffer irreparable injury. Rather, Tamiami's complaint alleged that the Tribe had breached its duty to arbitrate as required by Article 12 of the Agreement and that, as a result of such breach, Tamiami was entitled to a district court order to compel arbitration under Article 23, which provided the contract remedy for a breach of Article 12. As the district court stated in its first omnibus order, "Tamiami Partner's Verified Complaint prays for the entry of a declaratory judgment, holding that the Tribe is bound by the Agreement's arbitration clause; and for an injunction compelling arbitration and enjoining the Tribe from taking any action to seize or assume control of the Enterprise pending arbitration." Id. at 568 n. 4. In short, the district court did not have a National Farmers case before it. Tamiami was not seeking an order enjoining the enforcement of an allegedly invalid tribal court judgment; thus, National Farmers' instruction that, when faced with a challenge to the validity of a tribal court judgment against a non-Indian, a district court must stay its hand to give the tribal court an opportunity to address the issue was inapplicable.
 
 
 [39]
 By citing Article 23, "Waiver of Sovereign Immunity," in its order, the Tribal Court tacitly acknowledged that the Tribe had agreed to waive its sovereign immunity and submit to the jurisdiction of the United States District Court for the Southern District of Florida in an action brought by Tamiami to enforce any award that Tamiami might receive in the arbitration proceedings the Tribal Court had ordered
 
 
 [40]
 According to the district court, Tamiami did not receive notice of the Tribal Court's July 16, 1992 order in the tribal suit until July 23, 1992--two days after it filed the emergency motion. Id. at 405 n. 9
 
 
 [41]
 The district court found that Tamiami's "work force had been decimated and that the working environment for Tamiami['s] present and prospective employees offered little, if any, job security." Id. at 405
 
 
 [42]
 The arbitration panel eventually convened on December 17, 1992
 
 
 [43]
 The district court order stated that "[a]bsent a statutory grant of jurisdiction ... [the court could not] declare unlawful a licensing process that, nevertheless, disturb[ed] its conscience." Id. We interpret the words "[a]bsent a statutory grant of jurisdiction" to mean absent the statutory grant, either explicitly or implicitly, of a right of action. See Bell v. Hood, 327 U.S. 678, 681, 66 S.Ct. 773, 775, 90 L.Ed. 939 (1946)
 
 
 [44]
 The panel had jurisdiction to decide only two of the three appeals. In the first appeal, the court had jurisdiction to review the district court's August 19, 1992 omnibus order under 28 U.S.C. Sec. 1292(a)(1) because the order denied Tamiami's application for injunctive relief. In the second appeal, the court had no jurisdiction to review the district court's September 15, 1992 order denying Tamiami leave to amend its complaint. We note that the panel's decision referred to Tamiami's proposed amended complaint, id. at 507; it did so, however, in addressing the question presented in the first appeal: whether the district court had subject matter jurisdiction to hear the case. As noted in the text, the court had jurisdiction over the third appeal under 28 U.S.C. Sec. 1292(b)
 
 
 [45]
 We note, in passing, that it was not the panel's responsibility to search the record for federal questions; the responsibility belonged to the plaintiff. "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 809 n. 6, 106 S.Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986)
 
 
 [46]
 Although the Tribe's chosen arbitrator did not participate in the final hearing on September 23, he did file a formal dissent to the panel's October 6 decision and award
 
 
 [47]
 See infra section II.B
 
 
 [48]
 On March 16, the individual defendants answered Tamiami's amended complaint. Although their answer is not before us, we note in passing that, in addition to denying Tamiami's allegations of misconduct, these defendants alleged that they could not be held liable as "individual officials acting outside the scope of their authority, because the [amended] complaint in fact and in substance pleads only matters against the Tribe and tribal entities." This statement is false; the amended complaint contains numerous allegations of misconduct on the part of the individual defendants
 Furthermore, the individual defendants' answer acknowledged that "Miccosukee law always required adherence to applicable federal law." It is not clear what these defendants intended to convey through this statement.
 
 
 [49]
 On March 29, the individual defendants moved the district court to stay further proceedings pending the disposition of these appeals. On March 31, the court granted the stay. In the same order, the court reaffirmed its October 27, 1993 order freezing the MIB reserve account but rejected Tamiami's request for a preliminary injunction directing the individual defendants to reinstate Tamiami as manager of MIB. The March 31 order has not been appealed
 
 
 [50]
 Tamiami's claims against the Tribal Court were moot because, as the district court observed in its February 28 order dismissing the Tribal Court from the suit, the Tribal Court was no longer exercising jurisdiction over the parties
 
 
 [51]
 Tamiami's amended complaint is a quintessential shotgun pleading, replete with vague and cursory allegations. The claims we describe in the text are gleaned from a fair reading of the amended complaint
 
 
 [52]
 The Business Council, whose members also serve as the members of the Gaming Agency, handles the Tribe's business affairs
 
 
 [53]
 An order restoring Tamiami as the MIB operator would, in effect, restore the status quo as of April 12, 1993, a form of relief specifically requested in Tamiami's amended complaint
 
 
 [54]
 The Business Council and the Gaming Agency are not parties to the Management Agreement. Accordingly, we do not read Tamiami's allegations as seeking relief against these tribal entities for the Tribe's breach of the Agreement. Any relief granted against these tribal entities, therefore, would be purely ancillary, in aid of the district court's jurisdiction to litigate to final judgment Tamiami's breach of contract claim against the Tribe
 
 
 [55]
 We do not read Tamiami's amended complaint as asserting that the Tribe, through the Business Council, abused its licensing authority
 
 
 [56]
 We presume that Tamiami does so because it could have no statutory claim unless this right of action is implied in IGRA
 
 
 [57]
 In its amended complaint, Tamiami included as individual defendants two Tribal Court judges and the conservator for MIB appointed by the Gaming Agency on April 13, 1993. Because Tamiami's claims against the Tribal Court are moot, its claims against its judges also are moot. Accordingly, we declare appeal No. 94-4405 moot as to them. Because the Tribal Court vacated the conservator's appointment, thus mooting Tamiami's claim against him, the district court properly dismissed him from the case on October 26, 1993. The individual defendants remaining in appeal No. 94-4405 are, therefore, the members of the Business Council and the Gaming Agency
 
 
 [58]
 Tamiami has pointed to nothing in IGRA's language that would give it the right to bring this claim against the individual defendants. See Davids v. Coyhis, 869 F.Supp. 1401, 1410 (E.D.Wis.1994) ("Even assuming that the defendants acted in violation of the IGRA and therefore outside the scope of their authority, plaintiffs cannot sue the defendants for violations of the IGRA unless such a cause of action is implicit in the IGRA."). We treat Tamiami as contending that IGRA has provided by implication this cause of action because Tamiami would have no claim otherwise. See supra note 56; infra note 72
 
 
 [59]
 The Agreement states in paragraph sixteen thereof that "all gaming under this Agreement shall be conducted in accordance with ... [IGRA]." The parties obviously inserted this provision into their contract in recognition of the fact that Congress, by enacting IGRA, has "expressly preempt[ed] the field in the governance of gaming activities on Indian lands," S.Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. In addition, Sec. 2713(d) states that "[n]othing in [IGRA] precludes an Indian tribe from exercising regulatory authority provided under tribal law over a gaming establishment within the Indian tribe's jurisdiction if such regulation is not inconsistent with [IGRA] or with any rules or regulations adopted by the Commission." Accordingly, the parties were required to comply with IGRA's provisions and the Commission's regulations
 
 
 [60]
 Tamiami's amended complaint alleges that the Tribe has purposefully circumvented the requirements of Sec. 2710(c) of IGRA, incorporated in the Agreement, that relate to licensing procedures in order to oust Tamiami from the MIB facility and thereby terminate the Agreement
 
 
 [61]
 As we discuss in subsection III.B.1.a. infra, however, Tamiami cannot maintain its breach of contract claim in the face of the Tribe's plea of sovereign immunity
 
 
 [62]
 Tamiami's IGRA claims are not "immaterial and made solely for the purpose of obtaining jurisdiction"; nor are they "wholly insubstantial and frivolous." Bell, 327 U.S. at 682-83, 66 S.Ct. at 776
 
 
 [63]
 As noted in section II.D. supra, the district court also dismissed Tamiami's claims against the Business Council and the Gaming Agency. We treat the claims against those entities and the claims against the Tribe as one and the same
 
 
 [64]
 We do not consider the case of the defendant members of the Tribal Court because the case against them is moot. See supra note 57
 
 
 [65]
 Article 12 also provides that an "[arbitration] award ... may be entered in and shall be specifically enforceable in any court of competent jurisdiction." Because the Tribe has limited its waiver of sovereign immunity under Article 23 to suits brought against it in the Southern District of Florida, it is apparent that a suit by Tamiami against the Tribe will not lie "in any court of competent jurisdiction" except the Southern District of Florida. The parties seemed to have agreed, however, under Article 12, that the Tribe could waive its sovereign immunity and enforce an arbitration award in any court of competent jurisdiction--for example, in the Circuit Court of Dade County, Florida
 
 
 [66]
 Tamiami's original complaint sought an order compelling the Tribe to submit to arbitration; its amended complaint, however, does not seek that relief. Tamiami remains free, of course, to seek enforcement in the district court of the October 6, 1993 arbitration award and to seek an order in the district court compelling arbitration of any remaining contract disputes
 
 
 [67]
 Tamiami's amended complaint effectively concedes this point in stating that "the parties selected binding arbitration as the exclusive forum for the resolution of all disputes arising out of or relating to the Agreement." (Emphasis added)
 
 
 [68]
 As we relate in section I.E. supra, a management contractor may seek district court review of "[a] decision of the Commission to give final approval of a fine levied by the Chairman or to order a permanent closure ...." 25 U.S.C. Sec. 2713(c). Furthermore, if the management contractor has standing under the Administrative Procedure Act (an issue that we do not decide here), it might seek district court review if the Commission were to disapprove of a new or existing management contract. Id. Sec. 2714; see infra section I.D
 
 
 [69]
 See infra section I.D
 
 
 [70]
 See infra subsection I.C.3., sections I.D. & I.E
 
 
 [71]
 See infra subsection I.C.2
 
 
 [72]
 We do not reach the question whether, despite the individual defendants' amenability to suit, Tamiami can state a claim for relief against them. We have determined, in subsection III.B.1.b., that IGRA provides no right of action for Tamiami's suit against the Tribe. We note that the district court must answer a similar question with respect to Tamiami's claims against the tribal officers: If, as Tamiami argues, the tribal officers have violated the authority the Tribe is capable of granting them, can a cause of action against those officers be found, either implicitly or explicitly, in IGRA? See infra note 58